In the Matter of the Application of INTERNATIONAL RAILWAY COMPANY, Respondent, for a Writ of Mandamus against THE PUBLIC SERVICE COMMISSION, SECOND DISTRICT.

THE CITY OF BUFFALO, Appellant.

**Street railways — public service commission — jurisdiction to regulate rates of fare in city of Buffalo — Milburn agreement.**

1. The power to regulate railroad rates is the power to increase them if inadequate just as truly as it is the power to reduce them if excessive, and there is no distinction between regulation directly by the legislature and regulation indirectly through a commission.

2. In a case where the local authorities, in imposing a condition to their consent to the construction and operation of a street railroad, have consented that the legislature may change it, the public service commission has jurisdiction and power to regulate the rate of fare to be charged.

3. By a clause of the Milburn Agreement between the city of Buffalo and its various street railways thereafter ratified by the legislature (L. 1892, ch. 151) it is provided that "nothing in this contract contained shall be construed to prevent the legislature from regulating the fares of said companies or either of them." Subsequent action by the local authorities reincorporated this covenant. Municipality and railroads thereby joined in the declaration that the rate fixed by their agreement should be, not final but provisional, subject, in case of need, to re-examination and readjustment by the agents of the state. The public service commission, therefore, has power to fix just and reasonable rates of fare by increasing them if inadequate or reducing them if excessive.

4. The provision in subdivision 6 of section 49 of the Public Service Commissions Law (Cons. Laws, ch. 48) that "nothing herein contained shall affect or modify" the terms of the contract between the city of Buffalo and the railroads, is not a limitation upon the whole section but upon subdivision 6 only, which applies to the regulation of transfers. (*Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244, explained and distinguished.)

*Matter of International Ry. Co.* v. *Public Service Comm.*, 188 App. Div. 944, affirmed.

(Argued June 6, 1919; decided July 15, 1919.)

APPEAL by the city of Buffalo, by permission, from an order of the Appellate Division of the Supreme Court in the third judicial department, entered May 23, 1919, which annulled a determination of the public service commission, second district, and remitted the proceeding to the commission for hearing and decision.

The facts, so far as material, and the question certified are stated in the opinion.

*William S. Rann, Corporation Counsel* (*George E. Pierce* of counsel), for appellant. The various franchises granted to the International Railway Company and its predecessors constitute and form contracts which are authorized and protected by both the state and Federal Constitution. (*People ex rel. W. S. R. R. Co.* v. *Barnard,* 110 N. Y. 548; *P. S. Comm.* v. *W. S. Ry. Co.,* 206 N. Y. 209; *People ex rel. F. El. Ry. Co.* v. *City of North Tonawanda,* 70 Misc. Rep. 91; *City of Cleveland* v. *C. C. Ry. Co.,* 194 U. S. 517.) The public service commission has no jurisdiction or authority to increase the rate of fare to be charged by a street railway company above the maximum fixed by contract or franchise agreement. (*Matter of Quinby* v. *P. S. Comm.,* 223 N. Y. 244; *Davidge* v. *City of Binghamton,* 62 App. Div. 525; *Brown* v. *Mayor,* 63 N. Y. 239.) The franchises granted to the International Railway Company provide for a rate of fare of not more than five cents and to that extent modify previously granted franchises and give the public service

commission the right to fix a rate of fare of not more than the maximum. (*P. S. Comm.* v. *W. S. Ry. Co.*, 206 N. Y. 209; *Matter of International Ry. Co.* v. *Rann*, 224 N. Y. 87.)

*Henry W. Killeen, Morris Cohn, Thomas Penney* and *M. W. Weimar* for respondent. The conditions of a franchise or consent, limiting rates of fare, do not constitute contracts beyond the power of the legislature to change. (*People ex rel. Vil. of South Glens Falls* v. *P. S. Comm.*, 225 N. Y. 216.) The *Quinby Case* (223 N. Y. 244) must be deemed exceptional, and as decided upon its own peculiar facts, and in no event is the rule of that case applicable to provisions in consents of local authorities granted pursuant to, or to corporations organized under, either the Railroad Law of 1890, or the Railroad Law of 1910, each of which laws was enacted upon the report of a statutory revision commission and is, therefore, excepted from the language of section 18 of article 3 of the Constitution by the provisions of section 23 of the same article. (*Colonial City Traction Co.* v. *Kingston Railroad Co.*, 154 N. Y. 495; *Oregon S. Nav. Co.* v. *Winsor*, 87 U. S. 64; *People ex rel. Vil. of South Glens Falls* v. *P. S. Comm.*, 225 N. Y. 216.)

CARDOZO, J. This appeal brings here the question whether the fares established by the so-called Milburn Agreement in the city of Buffalo may be increased by the public service commission if found to be inadequate.

On January 1, 1892, the Buffalo Railway Company, the West Side Street Railway Company, and the Crosstown Street Railway Company covenanted with the city of Buffalo for a sufficient consideration to abolish transfer charges, and establish a uniform fare of five cents for a continuous trip upon any portion of their lines. That is the Milburn Agreement, which was thereafter ratified by the legislature (L. 1892, ch. 151). None

of these roads was then subject, in the enjoyment of its franchise, to any condition imposed by the local authorities, affecting rates of carriage. Some of the franchises went back to days when the consent of the local authorities was not required by the Constitution (Constitution, art. III, sec. 18, amendment of 1875). None had been coupled with any conditions in respect of rates, except such conditions as had been imposed by the legislature itself. The power to supervise and regulate had been exercised by the legislature in the past, and against these very roads. The Milburn Agreement made no attempt to escape its exercise in the future. On the contrary, there was express provision that " nothing in this contract contained shall be construed to prevent the legislature from regulating the fares of said companies, or either of them." The companies signing that agreement, together with the Buffalo Traction Company, were later consolidated under the name of the International Railway Company. From time to time, upon the application of the consolidated company, the local authorities gave consent to extensions of the route, and, in so doing, again limited the fare to not more than five cents. At the same time, however, they provided that " all the terms, provisions and conditions " of the Milburn Agreement should be deemed a part of the consent. They thus reincorporated the covenant that the fares should remain subject to regulation by the legislature.

In December, 1916, the city of Buffalo, believing the fare to be too high, petitioned the public service commission to fix a just and reasonable rate (Public Service Commissions Law, sec. 49, subd. 1; Consol. Laws, chap. 48). For nearly two years that proceeding remained dormant. The war was at hand; and with it came enormous increase in the cost of maintenance and operation. The question was no longer whether rates should be lowered. The question was whether there was not need, if bankruptcy was to be averted, that rates should

be increased (*Matter of International Ry. Co. v. Rann,*
224 N. Y. 83). The council of the city of Buffalo passed
a resolution consenting to an increase, but a referendum
was demanded (*Matter of Int. Ry. Co. v. Rann, supra;*
Charter of City of Buffalo, L. 1914, ch. 217, as amended
by L. 1916, ch. 260, sec. 31), and the resolution was
vetoed by the electors. The company then turned for
relief from the representatives of the locality to the
representatives of the state at large. It answered the
dormant petition on file with the commission. It said
that the rates, instead of being too high, were too low,
and joined in the city's prayer that they be reconsidered
and revised. The commission refused to accept the
answer on the ground of want of power. The Special
Term granted a mandamus. The proceeding was after-
wards changed by amendment into one of certiorari.
The Appellate Division annulled the ruling of the com-
mission, and remanded the proceeding for hearing and
decision. Upon the appeal thereafter allowed to this
court, the following question has been certified:

" Has the public service commission jurisdiction and
power under the facts shown in this proceeding to regu-
late the rate of fare to be charged by the respondent for
the transportation of passengers in the city of Buffalo?"

We think the power must be upheld. This is not a
case where demand is made upon the commission to
abrogate a defeasance reserved by the local authorities
as one of the conditions of a franchise. This is a case
where the local authorities, in imposing a condition, have
consented that the legislature may change it, and have
thus renounced the right of forfeiture or revocation that
might otherwise be theirs. . " Nothing in this contract
contained shall be construed to prevent the legislature
from regulating the fares of said companies, or either
of them." In the light of this provision, amendment
by legislation must be held to have been as much within
the contemplation of the parties as amendment by agree-

ment (*Knoxville Water Co.* v. *Knoxville*, 189 U. S. 434, 437). There is nothing to show, and we have no right to assume, that the reservation of the power of the state was for the benefit of one of the parties to the exclusion of the other. The power to regulate rates is the power to increase them if inadequate just as truly as it is the power to reduce them if excessive (*People ex rel. Village of Glens Falls* v. *Public Service Commission*, 225 N. Y. 216; *Board of Survey* v. *Bay State Street Ry. Co.*, 224 Mass. 463; *People ex rel. N. Y. Steam Co.* v. *Straus*, 186 App. Div. 787; affd., 226 N. Y. 704; *People ex rel. Ulster & Delaware Railroad Co.* v. *Public Service Commission*, 171 App. Div. 607; affd., 218 N. Y. 643; *Armour Packing Co.* v. *U. S.*, 209 U. S. 56). Nor is there anything in the attempted distinction between regulation directly by the legislature and regulation indirectly through a commission. The public service commission is the delegate of the legislature; and regulation by the one is regulation by the other (*Village of Saratoga Springs* v. *Saratoga Gas, Electric L. & P. Co.*, 191 N. Y. 123). The situation, then, is this: Municipality and railroad have joined in the declaration that the rate fixed by their agreement shall be, not final, but provisional. It is to be subject, in case of need, to re-examination and readjustment by the agents of the state. The need that was foreseen as possible, has arisen. In upholding the jurisdiction of the commission to deal with it, we do not override the conditions of the franchise. We heed and enforce them. There are times when the police power modifies a contract in spite of the intention of those who have contracted. Here its action is in aid of their intention. The covenant which limits rates is a condition of the consent, but only in equal measure with the covenant preserving and defining the power of amendment. So far as the power of the commission is concerned, the result is the same as if no condition had been imposed at all.

We do not overlook the provision of subdivision 6 of

section 49 of the Public Service Commissions Law (Consol. Laws, chap. 48) that " nothing herein contained shall affect or modify " the terms of the contract of January 1, 1892, between the city of Buffalo and the railroads. Section 49 contains eight subdivisions. The first clothes the commissions with power to regulate rates. The sixth clothes them with power to regulate transfers. The sentence quoted is not a limitation upon the whole section. It is a limitation upon subdivision 6. It is part of a single paragraph which is marked off by separate numerals from those that precede and follow. The meaning is not doubtful. Transfer charges upon these lines are not to be reinstated by the commission. The railroad system is to remain a unit. Rates, however, are to continue subject to the same control that might be exercised if there were in truth a single line. The source of the power to reduce rates is the same as the source of the power to increase them. The legislature surely did not mean, by its qualification of subdivision 6, to withdraw from the commission the power to reduce. If that is so, it has not withdrawn the power to increase. We find in the Milburn Agreement itself the same distinction between changes affecting transfers and changes affecting rates. By the terms of that agreement, transfer charges are abolished without reservation. Rates are fixed provisionally, subject to regulation by the legislature. Neither the statute nor the Constitution prohibits the exercise by the commission, as the delegate of the legislature, of the power thus reserved.

Nothing inconsistent with this ruling is to be found in previous decisions. We held in *Matter of Quinby* v. *Public Service Commission* (223 N. Y. 244) that in the absence of " clear and definite language," it would not be assumed that the legislature had authorized the public service commission to nullify conditions imposed by local authorities whose consent to the construction and operation of a street railroad was required by the Con-

stitution. That decision was explained and limited in *People ex rel. Village of Glens Falls* v. *Public Service Commission* (225 N. Y. 216). The Constitution says that " no law shall authorize the construction or operation of a street railroad " unless the consent " of the local authorities having the control of that portion of a street or highway upon which it is proposed to construct or operate such railroad be first obtained " (Constitution, art. III, sec. 18). This consent may be absolute, or it may be subject to a condition (*Matter of Quinby* v. *Public Service Comm., supra,* p. 259; Railroad Law, sec. 173; Consol. Laws, ch. 49; also, Greater N. Y. Charter, sec. 73). The condition, if it touches the future operation of the road, has the force of a condition subsequent, and if its terms are not fulfilled, the consent may be revoked (*People ex rel. West Side R. R. Co.* v. *Barnard,* 110 N. Y. 548, 557; *Public Service Comm.* v. *Westchester St. R. R. Co.,* 206 N. Y. 209, 219; *Matter of N. Y. Electric Lines Co.* v. *Empire City Subway Co.,* 235 U. S. 179, 194; *N. Y. Electric Lines Co.* v. *Gaynor,* 218 N. Y. 417; *State ex rel. Kansas City* v. *East Fifth St. R. Co.,* 140 Mo. 539, 553). It is one thing to annul an independent covenant, which, though part of the consideration for the grant, does not condition the grant itself. It is another thing to annul a condition which operates, by way of defeasance of the franchise, to terminate the grant. Our decision in the *Quinby* case must be read in the light of that distinction. A municipality may be willing to have an electric railroad in its streets; it may be unwilling to have a railroad run by steam. It may be willing to have a railroad that can furnish cheap transportation; it may be unwilling to have another. No contract can withdraw from the legislature the power of regulation while the consent of the municipality to the presence of the road continues. That is settled beyond doubt (*Matter of Quinby* v. *Public Service Comm., supra,* p. 260; *Union Dry Goods Co.* v. *Georgia*

31

*P. S. Corp.*, 248 U. S. 372; *City of Englewood* v. *Denver & S. P. Ry. Co.*, 248 U. S. 294; *Milwaukee Electric Ry. & Light Co.* v. *Wisconsin R. R. Comm.*, 238 U. S. 174; *City of Rochester* v. *Rochester R. R. Co.*, 182 N. Y. 99, 115). The legislature may say that, subject to the condition subsequent annexed to the consent of the locality, there shall be a change of motive power or an increase of the rates. It may say that if the local authorities do not promptly manifest the election to revoke, the condition will be waived. The doubt is whether, going farther, it may wipe out the condition altogether, and transform a consent that was qualified into one that is absolute (*Allegheny City* v. *Millville, E. & S. S. Ry. Co.*, 159 Penn. St. 411). In deciding the *Quinby* case, we left that question open, as we leave it open now. On the one hand, it is argued that the condition admits of no exception, since none has been expressed (*Columbus Ry., P. & L. Co.* v. *City of Columbus, Ohio*, United States Supreme Court, April 14, 1919); on the other, that by implication its binding force is to continue only in default of legislation that shall cover a like field. We assume that much may be said in favor of each view. Our purpose at this time is not to balance the competing arguments, but merely to recall and emphasize the grounds of the decision rendered. We found a limitation of the rate of carriage lawfully imposed by a municipality as one of the conditions of its consent (Railroad Law, sec. 173). We found nothing in the statute expressly authorizing its annulment. We saw that the effect of the annulment would be to abrogate a defeasance, and impose upon the streets of the city a burden in perpetuity. In default of " clear and definite language," we followed the settled rule that " a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score " ( *U. S.* v. *Jin Fuey Moy,* 241 U. S. 394, 401; *Tauza* v. *Susquehanna Coal Co.,* 220 N. Y. 259, 267).

No such situation is before us now. The legislature, in regulating the respondent's fares, has not said that local authorities, whose consent was defeasible, shall be deemed to have consented absolutely. It has accepted the consent as written, and availed itself of a power of amendment which was one of the conditions of the grant.

The order should be affirmed, with costs, and the question certified answered in the affirmative.

CHASE, COLLIN, HOGAN, MCLAUGHLIN, CRANE and ANDREWS, JJ., concur.

Order affirmed, etc.