In the Matter of the Application of JAMES W. FLEM-
ING, Individually and as Mayor of the City of Troy,
and of the CITY OF TROY, a Domestic Municipal
Corporation, for Alternative Prohibition Order
Commanding the Public Service Commission of the
State of New York and the United Traction Com-
pany and Each of Them to Desist and Refrain from
any Further Proceeding in the Matter of the Appli-
cation of the United Traction Company for Per-
mission to Increase its Rate of Fare in the City of
Troy to the Sum of Eight Cents, as Prayed For in
a Petition Filed by Said United Traction Company
with the Public Service Commission on or About
the 10th Day of November, 1921.

(Supreme Court, Albany Special Term, December, 1921.)

Street railways — fare — municipal corporations — franchise —
legislative authority — legislature has full power to deter-
mine conditions local authorities may attach to railroad con-
sents — rate of fare subject to regulation by legislature —
city of Troy — public service commission has jurisdiction to
fix rates, notwithstanding franchise agreement — writ of
prohibition denied — Public Service Commissions Law, as
amended by Laws of 1921, chap. 335.

While a city although having no constitutional authority to
prescribe the rate of fare may impose as a condition to the
giving of its consent to the operation of a street railway within
the corporate limits that a stipulated rate of fare shall be
charged, the legislature has full power to determine the con-
ditions that local authorities may attach to railroad consents
to be given in the future.

The state's right to regulate fare, which necessarily includes
the power to increase the same, if inadequate, is an implied
part of any contract for the operation of a railway upon the
streets of a city and the rate of fare provisionally fixed by
such a contract is subject to regulation by the legislature.

Where, therefore, the United Traction Company, the successor

in interest of several street railroads formerly operating under franchises created by the city of Troy on August 5, 1890, and at various times thereafter down to November, 1895, upon consents which provided that the rate of fare to be collected should not exceed the sum of five cents, made an application to the public service commission, which under the statute (Public Service Commissions Law, as amended by chapter 335 of the Laws of 1921), has full jurisdiction to fix reasonable rates "notwithstanding that a higher or lower rate, fare or charge has been heretofore prescribed by general or special statutes, contract, grant, franchise condition, consent or other agreement," for permission to increase its rate of fare within the city to the sum of eight cents, an application on the part of the city for a writ of prohibition commanding the public service commission and the railway company to refrain from proceeding on such application for an increase of fare will be denied, on the ground that there being no question involved as to the annulment of a condition, the abrogation of a defeasance or impairment of an obligation, the commission has both jurisdiction and power to grant the particular relief asked for, so far as the local franchises are concerned.

APPLICATION for writ of prohibition.

Thomas H. Guy, corporation counsel, for applicant.

Ledyard P. Hale, for Public Service Commission.

John E. MacLean, for United Traction Company.

HINMAN, J. This is an application on the part of the city of Troy for a writ of prohibition commanding the public service commission and the United Traction Company to refrain from further proceedings in the matter of the application of said company for permission to increase its rate of fare within the city of Troy to the sum of eight cents.

There may be question as to whether prohibition will lie but all parties have expressly stated their desire to have the matter disposed of upon the merits of the constitutional question involved.

The United Traction Company is the successor of several street surface railroads formerly operating upon the streets of the city of Troy under so-called franchise agreements with said city. The United Traction Company has succeeded to all their rights and obligations under said agreements. These agreements were consents of the city to use certain streets of the city for the construction and operation of the several railroads, which consents embodied certain terms and conditions which were agreed to by the railroads. These consents were obtained at various times between August 5, 1890, and November 25, 1895. The consents of August 5, 1890, contain the following provision as to the rate of fare that may be collected:

" Section 4. The rate of fare to be collected for a ride in any one general direction upon the railroad of said company within the City of Troy shall not exceed the sum of five cents."

This fare limitation has been incorporated either expressly or by reference in other consents. The Constitution of the state says that " no law shall authorize the construction or operation of a street railroad " unless the consent " of the local authorities having the control of that portion of a street or highway upon which it is proposed to construct or operate such railroad be first obtained." Const., art. III, § 18. The Constitution does not in any way prescribe or limit the fare to be charged by a street railway company nor does it delegate any power in relation thereto to the municipality. There is a limitation of the legislative power in one respect only. The consent of the municipality must be obtained before a law can authorize construction or operation on any of its streets. Like consent was required by statute prior to 1875 when the provision therefor was inserted in the Constitution. The effect of placing it in the Con-

stitution was to prevent the legislature from passing a law without providing for such consent.

While the city has no constitutional authority to prescribe the rate of fare, the courts have repeatedly held that a city could impose as a condition to giving consent that a stipulated rate of fare should be charged. *Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244, 259. In such cases, however, the courts were dealing only with the question of the power of the local authorities over the corporation and not with the power of the local authorities to impose terms which would take from the legislature its regulatory or police power to fix fares. Id.

It is expressly held by the Court of Appeals that there is full power in the legislature to determine the conditions that the local authorities may attach to the railroad consents to be given in the future. *People ex rel. City of New York* v. *Nixon*, 229 N. Y. 356, 360. It has been the annulment of a condition attached to a railroad consent granted prior to such legislative action which the Court of Appeals has refused to pass upon. Id. A doubt has been expressed as to whether and in what cases the legislature may wipe out the condition altogether and "transform a consent that was qualified into one that is absolute." *Matter of International Ry. Co.* v. *Public Service Comm.*, 226 N. Y. 474, 482. That question has been left open, except that certain of the judges of that court have individually expressed the opinion that contracts cannot be made which in any way limit the right of the state, by virtue of its police power, to regulate rates of fare, and to modify rates fixed in a local franchise. Attention has been called to that fact in *Matter of McAneny*, 198 App. Div. 205, in a case involving the question of legislative power by retroactive legislation to modify rates fixed in local fran-

chises, and the Appellate Division in the first department has sustained the power of the legislature, holding that a majority of the judges of the Court of Appeals had so plainly intimated their views as to leave the question settled beyond reasonable doubt.

I presume that this court at Special Term is bound by that decision but since the Court of Appeals in its prevailing opinions has so carefully limited its rulings to the necessities of each case so as to avoid the decision of the question involved here, it has occurred to me that it would be helpful to apply to the particular facts of this case the principles which have been well settled by the Court of Appeals in cases of this character.

In *Matter of Thirty-fourth St. R. R. Co.,* 102 N. Y. 343, the limits of the constitutional authority of municipalities under article III, section 18 of the Constitution were considered and it was there said: " But the Constitution, neither by express language nor by implication abridges the legislative power over the subject outside of the matters particularly enumerated. It needs no citation of authorities to sustain the postulate, that except as restrained by the Constitution, the legislative power is untrammeled and supreme, and that a constitutional provision which withdraws from the cognizance of the legislature a particular subject, or which qualifies or regulates the exercise of legislative power in respect to a particular incident of that subject, leaves all other matters and incidents under its control." P. 350.

This principle has been repeatedly sustained and the Court of Appeals has directly applied it in a very recent gas company case. *Public Service Comm.* v. *Pavilion Natural Gas Co.,* 232 N. Y. 146. The question was whether a gas company could increase the maximum rates fixed in local fran-

chises and agreements by simply filing a schedule of rates with the public service commission pursuant to legislative authority therefor, under subdivision 12 of section 66 of the Public Service Commissions Law (Laws of 1910, chap. 480). The court had already held, as to similar local franchises (*Town of North Hempstead* v. *Public Service Corp. of L. I.,* 231 N. Y. 447) that by implication the statute became a part of the terms of consent and that the gas company on complying with the statute was empowered to abrogate the rates stipulated in the franchises or agreements and to put into operation a new schedule of just and reasonable rates. That case settled the right to do so as to all franchises and agreements given or entered into subseqent to the time when the statute became effective.

The right to increase the maximum rates specified in franchises and agreements made prior to the passage of such statute was decided in the *Pavilion Natural Gas Co. Case, supra.* The court held that the same rule applied to them, saying: " There was implied in all such franchises or agreements, and coupled with the terms thereof, a provision that the legislature, in the exercise of its powers, might thereafter, either itself, or acting through another, regulate the rates thus fixed, and increase or lower them." P. 150.

Also, in *People ex rel. City of New York* v. *Nixon,* 229 N. Y. 356, the Court of Appeals held that statutes existing at the time of granting railroad consents are read into the contract. The court said: " They enter by implication into its terms. They do not change the obligation. They make it what it is. * * * The commission is now holding the city to terms which were accepted by implication when the conditions were imposed."

The local franchises granted by the city of Troy, involved here, were created on August 5, 1890, and at various times thereafter down to November, 1895. Prior to the granting of any of these franchises the legislature had entered the field and itself expressly prescribed the maximum rate of fare at five cents. General Street Railway Law; Laws of 1884, chapter 252. In May of 1890, by chapter 565 of the laws of that year, effective May 1, 1891, the legislature passed another railroad law and served express notice upon the local authorities and all railway corporations that " The legislature expressly reserves the right to regulate and reduce the rate of fare on any railroad constructed and operated wholly or in part under such chapter [Laws of 1884, chap. 252, *supra*] or under the provisions of this article " (article on street railroads). Laws of 1890, chap. 565, § 101. This section 101 of the Railroad Law of 1890 became section 181 of the revised Railroad Law of 1910, and is still the law.

The power to " regulate" fares necessarily includes the power to increase the same if inadequate just as truly as it includes the power to reduce them if excessive. *Matter of City of Niagara Falls* v. *Public Service Comm.*, 229 N. Y. 333, 350; *Matter of International Ry. Co.* v. *Public Service Comm.*, 226 id. 474, 479. The words " to regulate and reduce," as used in section 101 of the statute of 1890, are not entirely apt, but the section read as a whole is susceptible of no other natural interpretation than that the legislature has, for greater certainty, expressly included the reservation of its rights to " reduce " a rate of fare. See *Matter of Quinby, etc.*, 223 N. Y. 244, 258, construing § 49, subd. 1 of the Public Service Comm. Law, and *People ex rel. Village of South Glens Falls* v.

*Public Service Comm.*, 225 id. 216, construing § 66, subd. 5 of the same law.

Under the decisions in the *Pavilion Natural Gas Case, supra,* and *People ex rel. City of New York* v. *Nixon, supra,* by implication the statute of 1890 became a part of the terms of subsequent consents and as to all consents granted prior thereto "* * * there was implied * * * and coupled with the terms thereof, a provision that the legislature, in the exercise of its powers, might thereafter, either itself, or acting through another, regulate the rates thus fixed, and increase or lower them."

Section 101 of the statute of 1890 was actually in force when most of the consents involved here were granted. Three of them, however, were granted in August and September of 1890, several months after the statute of 1890 was passed. While not effective as an operating statute until the following May, the local authorities and the company were bound to take notice of the fact that the law had been passed and that the legislature had served notice of its right to regulate the rate of fare on any railroad whether constructed and operated under the act of 1884 or the act of 1890. Thus the constitutional power of the legislature, untrammeled and supreme in the matter of rate-making, was openly revealed by decisions and statute prior to the granting of any of the franchises in question here. This is of importance at least in determining the intention, express or implied, of the parties at the time the consents were given. It would require clear, definite and unambiguous language in a consent thereafter granted to indicate any intention to defeat the reserved and implied power of the legislature to regulate the fare, assuming for the sake of argument that it could be defeated by attaching to the consent an obligation in the nature of a defeasance

or condition subsequent, working a forfeiture or revocation of the grant. The jurisdiction of the state cannot be reduced by implication. *Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244, 259. It has been repeatedly held that " * * * power to establish rates is not essential to the consent of local authorities and will not be implied and that the legislature is at all times supreme in the matter." *Matter of Quinby, supra,* 261, and cases cited. " Every doubt must be resolved in favor of the continuance of the power in the State." *People ex rel. Glens Falls* v. *Public Service Comm.*, 225 N. Y. 216, 225. " One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject matter." *People ex rel. City of New York* v. *Nixon,* 229 N. Y. 356, 359.

In a case recently decided in the United States Supreme Court (*San Antonio* v. *San Antonio Public Service Co.*, 255 U. S. 547) it was held that a maximum fare limitation in a street railway franchise, granted by a city which was vested with the rate regulating power and forbidden to restrict it by contract, should be taken as in exercise of the regulating power and not as imposing a unilateral contract or condition upon the grantee to observe the limitation even though it become confiscatory, and especially so where the case exhibits no actual intention of the parties to bind the grantee and not the city.

Chief Justice White, delivering the opinion of the court in that case, reveals the error underlying the argument advanced that there was a condition binding upon the grantee even though the power of government was wholly uncontrolled by contract. Speaking of the suggestion made in argument, that although no contract was possible under the constitutional restric-

tion. which would bind the city not to lower the rate, nevertheless there was a unilateral contract or condition resulting from the granting of the franchise which bound the railway company to the franchise rate, Chief Justice White said that the proposition was irrelevant to the case being considered, since there was not the slightest suggestion of any attempt on the part of the parties consciously to produce such a condition. Continuing, he said: " But besides, the error underlying the proposition is not far to seek. The duty of an owner of private property used for the public service to charge only a reasonable rate and thus respect the authority of government to regulate in the public interest, and of government to regulate by fixing such a reasonable rate as will safeguard the rights of private ownership, are interdependent and reciprocal. Where, however, the right to contract exists and the parties, the public on the one hand and the private on the other, do so contract, the law of the contract governs both the duty of the private owner and the governmental power to regulate. Were, therefore, as in the case supposed in the argument, the regulating power of government wholly uncontrolled by contract, it would follow that that power would be required to be exerted and hence the supposed condition operating upon the private owner would be nugatory. Such a case really presents no question of a condition, since it resolves itself into a mere issue of the exercise by government of its regulatory power."

In the case at bar, the city of Troy and the railroad agreed by implication of fundamental and existing law that the legislature had the right to regulate the rate of fare; and without any words of defeasance expressing an intention of the parties that there should be a forfeiture or revocation of the consent in

the event that the regulatory power of government should fix a rate of fare above the maximum rate fixed in the consent, the express agreement was that " the rate of fare to be collected * * * shall not exceed the sum of five cents." The legislature and the city were wholly uncontrolled by contract. By implication the city agreed to abide by the action of the legislature under its reserved regulatory power and in the portion of the agreement expressed, it did not fix an absolute rate of five cents, which the city would be bound not to lower, even as between the city and the corporation. It simply provided that the rate " shall not exceed the sum of five cents." Assuming that the city might have said, agreeably to the corporation, that it gave its consent only for the purpose of getting cheap transportation, namely, not to exceed a five cent fare, and that it annexed to the consent a condition subsequent revoking its consent whenever the rate should be fixed higher than that sum, it is plain that there was no such attempt on the part of the parties to produce such a condition. It is equally plain that both parties contracted with reference to the settled law when they acted, which was notice to the city that franchises thereafter granted must be coupled with no conditions inconsistent with the power of the legislature expressly or impliedly reserved and that " * * * Such a case really presents no question of a condition, since it resolves itself into a mere issue of the exercise by government of its regulatory power." *San Antonio* v. *San Antonio Public Service Comm., supra,* 556. The state is not now seeking to change the obligation of the city's contract with the company. The public service commission, acting under express authority, " * * * is now holding the city to terms which were accepted by implication when the conditions were imposed. This

is not to ' transform a consent that was qualified into one that is absolute ' as the result of retroactive legislation.'' *People ex rel. City of New York* v. *Nixon, supra,* 361.

Judge Cardozo, writing for the Court of Appeals in *Matter of International Ry. Co.* v. *Pub. Service Comm.,* 226 N. Y. 474, 482, explains the decision of that court in the *Quinby Case,* 223 N. Y. 244, and says : '' We saw that the effect of the annulment would be to abrogate a defeasance, * * *.'' The same learned judge, again speaking of the *Quinby* case in *People ex rel. City of New York* v. *Nixon,* 229 N. Y. 356, says at page 360 : '' It was the ' annulment ' of a condition already imposed, the ' abrogation of a defeasance ' already attached, the impairment of an obligation already created. * * *, which we refused to bring within the jurisdiction of the commission through words of doubtful import.'' The single point decided, however, was '' one of statutory construction.'' *Niagara Falls Case, supra,* 340. It was held that the legislature had not conferred jurisdiction upon the commission, whatever power it might have to do so.

Section 49, subdivision 1, of the Public Service Commissions Law was amended by Laws of 1921, chapter 335, by which amendment the commission was given full jurisdiction to fix reasonable rates '' * * * notwithstanding that a higher or lower rate, fare or charge has been heretofore prescribed by general or special statute, contract, grant, franchise, condition, consent or other agreement * * *.'' The question is no longer an open one as to whether the commission has the requisite jurisdiction. The legislature by amendment has said it has. The only question left apparently is the power of the legislature to permit the commission to annul a condition already imposed, to abrogate a defeasance already attached, to impair an

obligation already created. In this Troy case before me, there is no question of the annulment of a condition, no abrogation of a defeasance, no impairment of an obligation involved. The state's right to regulate the fare became an implied part of the contract and in construing the terms of that contract, the only natural interpretation to give to it is that the rate was fixed provisionally, subject to regulation by the legislature. Amendment by legislation was within the contemplation of the parties.

Thus in the case at bar the commission has jurisdiction and has the power to grant the particular relief prayed for in the application made to it by the United Traction Company so far as the local franchises received from the city of Troy are concerned.

It follows that the application for a writ of prohibition should be denied.

Ordered accordingly.