Hill, P. J..
The petitioner and appellant in each of the seven proceedings above entitled is an omnibus corporation, organized under the Transportation Corporations Law of the State, and each operates omnibus routes for the transportation of passengers in the city of New York. Each entered into a franchise contract with the city under which leave and a franchise was granted to operate the lines, the city to receive a percentage of the gross receipts. Each franchise is limited as to time, and contains forfeiture and other provisions not material to the issue here presented. The Public Service Commission ordered that proceedings be instituted to determine if the maximum *83 five-cent fare for one continuous ride between any two points within the limits of the authorized route was unduly preferential or in any wise a violation of any provision of law. Each petitioner and appellant has applied to the Supreme Court of the State to obtain an order under article 78 of the Civil Practice-Act, in the nature of prohibition. The applications came on before the Special Term, were denied, and the petitions dismissed on the merits.
The franchise contract issued to East Side Omnibus Corporation and Comprehensive Omnibus Corporation was dated March 28, 1933. It was modified on December 26th of the same year and at various times until March 10, 1941. Its petition alleges that the Second Avenue Railroad Corporation caused petitioner to be organized under the Transportation Corporations Laiv, for the express purpose of applying for a franchise for the operation of omnibuses and to motorize the street surface railroad formerly operated by the railroad corporation, and that the franchises to operate street railways held by the railroad corporation were perpetual and some were issued to its predecessors as early as December 15,1852. That under the terms of the omnibus franchise agreement the railroad company was required to pay to the city “ back taxes and paving charges ” in a considerable sum of money, and to surrender its perpetual franchises.
The franchise contract issued to the New York City Omnibus Corporation was dated December 26, 1933. Its petition alleged, and it is not denied, that it was organized through the activities of the New York Railways Corporation, and as a condition, that corporation and its subsidiaries were required to file a declaration of intent to abandon certain surface railway routes in the city. It is further alleged that there were 113 such franchises, many being of considerable age.
The franchise contract of the Madison Avenue Coach Co., Inc., is also dated December 26,1933. The petition states that it was organized through the activities of the New York Railways Corporation, and as a condition the city required the organizing corporation and the New York & Harlem Railroad Company to file a declaration of intention to abandon all operations on the Fourth and Madison Avenue Street surface railway routes which, prior to October 10, 1932, had been owned by the New York & Harlem Railroad Company. That all of these franchises for the operation of street railways had been granted prior to 1907 and as far back as 1831. That the greater and *84 most important operations of petitioner’s present routes cover streets wherein street railways had been operated under franchise granted between January 1, 1875, and June 30, 1907, and that each contained provisions for operation at a five cent fare.
The franchise of the Eighth Avenue Coach Corporation was dated October 16,1935, and was limited to a period of ten years. That as a condition to the granting of this franchise, transfers were to be issued under agreements with the New York Railways Corporation and New York City Omnibus Corporation. That for more than fifty years, street surface railways had been operated along substantially the same routes upon which this petitioner operates omnibuses, and that the New York Railways Corporation, on behalf of petitioner, operated the street railways following an official receivership and before petitioner received the franchise under which it now operates.
The franchise contract issued to Green Bus Lines, Inc., was dated October 19, 1936. It maintains and operates omnibus routes for the transportation of passengers exclusively in the boroughs of Brooklyn and Queens. It has provisions for commutation tickets, and a percentage of the gross receipts are payable to the city. It contains provisions and a recital that the New York City Board of Estimate and Apportionment had determined the money value of the franchise on the basis of operation at the maximum rates of fare (five cents) and that “ the continued maintenance of the maximum rates of fare ” was of the essence of the contract.
The franchise contract issued to the Manhattan & Queens Bus Corporation was dated December 30, 1936. The routes áre in the boroughs of Manhattan and Queens. The contract contains provisions similar to those mentioned as to the Green Bus Lines, Inc.
The franchise contract issued to the Queens-Nassau Transit Lines, Inc., was dated January 26, 1937, and is for the operation of routes exclusively in the borough of Queens. It contained a recital that the city required the petitioner to cause to be conveyed to the city of New York by New York and Queens Transit Corporation, without cost to the city, a private right of way- which had been used 1 ‘ by the City in the construction of 164th Street, the principal thoroughfare running between Jamaica and Flushing, in the Borough of Queens, City of New York.” In this case a hearing or trial was had at the Troy Special Term in advance of the decision.
The rule governing the authority of the Public Service Commission to abrogate franchise contracts between municipalities *85 and public utilities, as appears from the opinions and judgments in several still approved cases, might seem to lack the clarity of the rule in Shelley’s case. Judge Cardozo said in People ex rel. City of New York v. Nixon (229 N. Y. 356, 359), “ We held, however, in Matter of Quinby (223 N. Y. 244; 227 N. Y. 601, explained and limited in People ex rel. South Glens Falls v. Public Service Comm., supra), and again in Matter of International Ry. Co. v. Public Service Comm. (226 N. Y. 474), that the legislature did not intend to clothe the commission with the power to release the obligation of then existing contracts between railroads and municipalities when the contracts established rates as conditions of a franchise.” That such an attempt is being here made is the contention of the petitioners-appellants. A brief examination, at least of those three cases is indicated. The volume and page of the Glens Falls case is 225 N. Y. 216.
The Quinby case (supra) had to do with street car fares in the city of Rochester. There the street railway company asked for an increase of its rate of fare to six cents. The objection of the city was based upon an amendment to its charter fixing a five cent rate for one ride over the route of any corporation operating a street surface railway in the city, and because the franchise of the street railway, as a condition of the consent of the local authorities, fixed a like fare. From the opinion it appears that section 49 of the Public Service Commissions Law at that time provided: * ‘ Whenever either commission shall be of opinion, after a hearing had upon its own motion or upon a complaint, that the rates * * * are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in any wise in violation -of any provision of law, or that the maximum rates, fares or charges * * * are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall with due regard among other things to a reasonable average return * * * determine the just and reasonable rates ”. Yet it was determined that the Legislature had not granted the power of regulation to the Public Service Commission. The opinion stated (p. 264) “ The authority of the commission to regulate rates in such cases and thus to extinguish an undoubted power of the local authorities should fairly appear before it is assumed to exist. It follows that the public service commission is without jurisdiction
*86 People ex rel. Village of South Glens Falls v. Public Service Comm, (supra, 225 N. Y. 216) dealt with the price that a gas company was permitted to charge within a municipality with which it had contracted for a franchise, agreeing to furnish gas at no greater sum than $1.25 per thousand cubic feet. The gas company had increased its rate to $1.60 per thousand cubic feet. The Public Service Commission entertained the application to review the matter and approved the increase. The Appellate Division (185 App. Div. 912) reversed the decision of the commission. In the Court of Appeals the municipality 1 ‘ waived all question as to the reasonableness of the increase and stated that the only question presented was whether the franchise was such a binding contract that it could not be abrogated in any way by the gas company or by the public service commission. ’ ’ The commission determined that it had power to regulate the rate to be charged, notwithstanding the provisions of the franchise. The statute governing the power of the commission over gas companies, as appears from the opinion, was subdivision 5 of section 66 of the Public Service Commissions Law. Its terms were generally identical with those in the Quinby case (supra, 223 N. Y. 244). Section 72 of that act stated in part: ‘1 The commission within lawful limits may, by order, fix the maximum price of gas or electricity not exceeding that fixed by statute to be charged by such corporation or person, for the service to be furnished.” The Court of Appeals determined that the commission had power to regulate rates irrespective of the terms of the contract. The prevailing opinion states: “ This ease [Quinby] is not inconsistent or contrary to what is here stated. The matter there at issue was a railroad rate fixed by a city charter and contained in the street franchise to the company. We held that in view of article III, section 18, of the Constitution requiring the consent of the local authorities to the construction of a railroad that the power given to the public service commission to modify this rate should be distinctly and expressly conferred and that such power had not been given.” (P. 224.) Two judges held a contrary view, as appears from the dissenting opinion (p. 236): “ Both cases should in my judgment, stand upon the language quoted from the Quinby opinion to the effect that the legislature did not intend to delegate its power in cases where the rates of fare or price of gas have been established by and between the street railroad or gas companies respectively and the municipalities.”
*87 Matter of International Railway Co. v. Public Service Commission (226 N. Y. 474). Fares on street railways in the city of Buffalo in 1916 were established by the so-called Milburn Agreement which had been ratified by the Legislature. (L. 1892, ch. 151.) Under the agreement made on January 1, 1892, the Buffalo Railway Co., the West Side Street Railway Co. and the Cross Town Street Railway Co., covenanted with the city of Buffalo for a consideration to abolish transfer charges and establish a uniform fare of five cents. In December, 1916, (he city, believing the fare to be too high, petitioned the Public Service Commission to fix a just and reasonable rate. The proceeding remained dormant for nearly two years during the war, and because of the increased cost of maintenance and operation “ The question was no longer whether rates should be lowered. The question was whether there was not need, if bankruptcy was to be averted, that rates should be increased ”. (P. 477.) The City Council had consented to a resolution which was submitted to a referendum resulting in, a majority for a five-oent fare. The earlier proceeding was then revived and ultimately reached the Court of Appeals, upon a certified question, “ ‘ Has the public service commission jurisdiction and power under the facts shown in this proceeding to regulate the rate of fare to be charged by the respondent for the transportation of passengers in the city of Buffalo! ’ We think the power must be upheld. This is not a case where demand is made upon the commission to abrogate a defeasance reserved by the local authorities as one of the conditions of a franchise.” The opinion further states, “ The local authorities, in imposing a condition, have consented that the legislature may change it * * *. ‘ Nothing in this contract contained shall be construed to prevent the legislature from regulating the fares of said companies, or either of them.’ ” The opinion concludes: “ The legislature, in regulating the respondent’s fares has not said that local authorities, whose consent was defeasible, shall be deemed to have consented absolutely. It has accepted the consent as written, and availed itself of a power, of amendment which was one of the conditions of the grant.” The question certified was answered in the affirmative.
In City of New York v. Interborough R. T. Co. (257 N. Y. 20) “ the single issue is presented whether authority has been conferred upon the Transit Commission to increase the rate of fare upon subway and elevated railroads operated by the Interborough Rapid Transit Company. No other ques *88 tion is before us. ’ ’ The historical background of contracts No. 1, No. 2 and No. 3 is given by Judge O’Brien in the beginning of the opinion. The contracts and franchises stemmed from discussions and conferences had “ During the sixth and seventh decades of the last century ”. The opinion cites the Quinby and Nixon cases earlier discussed in this opinion, but not the International case. Contracts No. 1 and No. 2 were made prior to the passage of the Public Service Law in 1907, No. 3 thereafter. In each the fares were limited to five cents. The Public Service Commissions Law as to rates in this case is substantially identical with that earlier quoted in connection with other cases discussed in this opinion. The court reviewed a judgment in favor of the city of New York against the Transit Company restraining the latter from increasing the rate of fare on its subway and elevated lines, and an appeal from a determination made by the Transit Commission dismissing the Transit Company’s application for a hearing upon the subject of fares. There was an affirmance in each case, thereby determining that the five-cent provisions in the contracts were enfórcible irrespective' of the Public Service Commissions Law which granted power to the commission to fix rates when they appear to be insufficient to yield reasonable compensation.
While the issues may not be identical in the four cases discussed (Quinby, South Glens Falls, International and Interborough) yet there is such similarity that in view of the fact that our highest State court held in two that the Public Service Commissions Law did permit the abrogation of contract provisions contained in a franchise, and in two the opposite doctrine, it is not strange that there is uncertainty as to the rule.
Consideration of the changes in monetary values in the past and the claimed inflation of the present recommends a flexibility in this type of contracts. In times of inflation when monetary standards change and the purchasing power of money is lessened, the cost in dollars of furnishing a service increases, and similarly there is a decrease during depressions. Paraphrasing from an earlier quotation, there are times when the question is no longer whether rates should be lowered but rather whether they should be increased, to prevent bankruptcy of the utility.
The course of wisdom seems to lie with the doctrine that we need the flexibility incident to legislative control over this type of pnblic contract. Utilities should not be bankrupted; the public should not pay an excessive rate or fare. Contracts *89 improvident for either the owners or the patrons should be subject to legislative control. Such power seems to have been delegated to the commission by the Legislature. The general powers as to omnibus lines and corporations are contained in section 61 of the Public Service Law. Subdivision 5 of this section refers to section 63-b of the same law as to the manner in which the power is to be exercised. That section in part provides: “ After a hearing and after such an investigation as shall have been made by the commission or its officers, agents, examiners or inspectors, the commission may, by order, fix the just and reasonable rates, fares and charges to be charged by the corporation for the service to be furnished * * # >>
It may not be gainsaid that we are presently in a period of inflation, where services and things now cost an increased amount in dollars. Thus, normally the five-cent fare would be inadequate, and the assertion of the respondents could not be sustained. However, if the city was improvident in making the contracts, failing to recognize the economies which would result in the operation of individually motorized buses over the operation of cars on tracks driven from a central power station, a case for relief is presented. It was determined that the commission was without power to relieve the utility from improvident contracts in the Interborough and Quinby cases, but did have power in the South Glens Falls and International cases. With the duality of precedent, this intermediate appellate court, in the interim preceding the consideration of these cases by the court of last resort, should afford opportunity for relief, if unwise contracts were made. The orders should be affirmed, without costs.