**PACIFIC TELEPHONE & TELEGRAPH CO. v. WHITCOMB, Director of Public Works of Washington, et al.**

**HOME TELEPHONE & TELEGRAPH CO. OF SPOKANE v. DENNEY, Director of Public Works of Washington, et al.**

(District Court, W. D. Washington, S. D. April 22, 1926.)

Nos. 166–E, 167–E.

1. **Public service commissions ☞7—Most important, if not dominant, factor in determining basis of rate making for public utilities is cost of reproduction new, less depreciation, provided cost fairly reflects normal and stable prices prevailing at time.**

One of most important, if not dominant, factors in determining true basis of rate making for public utilities is cost of reproduction new, less depreciation of property devoted to public convenience at time of making rates, providing such cost fairly reflects normal and stable prices prevailing at time, and which will, with reasonable certainty, continue to prevail throughout period covered by rates fixed.

2. **Public service commissions ☞7.**

Method of valuation of public utilities for rate-making purposes, which considers only original cost of properties on prudent investment theory, *held* erroneous.

3. **Public service commissions ☞7—In determining valuation of public utility for fixing rates, depreciation must be deducted from cost of reproducing properties new.**

In determining valuation of property of public utility for purpose of fixing rates, depreciation must be deducted from cost of reproducing property new, representing difference between new property and property in condition it was at time of estimate.

4. **Public service commissions ☞7—Accrued depreciation of property of public utility must be ascertained by inspection and making estimates based thereon.**

Accrued depreciation in public utility's property must be ascertained by an inspection and making estimates based on facts which such examination discloses.

5. **Public service commissions ☞7—"Depreciation" taken into account in ascertaining rate base for public utility is diminution in value which takes place in physical thing, and not future depreciation which inevitably comes about by wear and tear.**

"Depreciation" of property of public utility to be taken into account in ascertaining rate base, is that diminution in value of property involved which takes place in physical thing and is ascertained by physical inspection of it, and is not future depreciation which inevitably comes about by wear, tear, obsolescence, and other factors.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Depreciate.]

6. **Public service commissions ☞7—Rate-making body for purpose of fixing rates cannot reduce what it considers excessive depreciation reserve fund by making inadequate provision for future depreciation.**

Rate-making body has no authority to reduce what it considers an excessive depreciation reserve fund for purpose of making future rates by making inadequate provision for future depreciation.

7. **Public service commissions ☞7.**

Average, working capital of public utility was properly taken into account by special master in determining rate basis.

8. **Public service commissions ☞7—"Going value" of public utility is additional value that purchaser will give because it is going concern with established business.**

"Going value" of public utility is additional value that purchaser will give for property and business of company because it is a concern with an established business.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Going Value.]

9. **Public service commissions ☞7.**

Special master, in determining rate base for public utility, properly held that going concern value rested largely on competent or expert opinion.

10. **Telegraphs and telephones ☞33(1)—State Department of Public Works cannot complain of special master's allowance to telephone company for going value testified to by expert.**

In suit by telephone company to enjoin enforcing rates of state Department of Public Works, the defendant cannot complain of amount accepted by special master as going value, where opinion of its expert was used.

11. **Telegraphs and telephones ☞33(1)—Contract of telephone company, giving another company 4½ per cent. of gross revenues for services and use of patents, held valid, and amounts paid thereunder properly chargeable to operating expenses in determining rate.**

Telephone company contracts with American Telegraph & Telephone Company, granting such company 4½ per cent. of gross revenues, for use of supplies, patents, and certain services, *held* valid, and amounts paid thereunder properly chargeable to operating expenses to be used as basis in determining rate.

12. **Courts ☞493(1)—Telephone company need not appeal to state court from order of state department of public works fixing confiscatory rates before bringing suit in federal court, where state Supreme Court had determined that, in fixing valuation, department should not recognize theory of reproduction new, less depreciation.**

A telephone company was not bound to appeal to the state courts as provided by state statute from order of state Department of Public Works before bringing suit in the federal court on the ground that orders were confiscatory, and in violation of the federal Constitution as in such case federal tribunals are

not bound by action of the state department, and particularly where it was obvious that appeal to state courts would have been idle and useless, as Supreme Court had prior thereto held that department in fixing rates should not recognize theory of reproduction new, less depreciation.

**13. Telegraphs and telephones ⟨☞⟩33(1)— Finding that return of less than 7½ per cent. on fair value of property of telephone company would be confiscatory held within proper limits.**

Finding that return of less than 7½ per cent. on the fair value of the property of a telephone company, plus working capital and going concern value, would be confiscatory, *held* proper.

**14. Constitutional law ⟨☞⟩70(1)—Federal court, in suit by telephone company to enjoin state department from enforcing rates, is not engaged in fixing rates of public utilities but in determining whether rate base adopted was confiscatory.**

Federal court, in suit by telephone company to enjoin state Department of Public Works from enforcing alleged confiscatory rates, is not engaged in the task of fixing rates of public utilities, but is to determine whether the rate base adopted by the department was in fact confiscatory.

**15. Telegraphs and telephones ⟨☞⟩33(1)— State department's order establishing rates of telephone company had effect of abrogating franchise rates and establishing department or statutory rates (Rem. Comp. Stat. Wash. § 10379).**

Although franchise contract between municipality and public utility corporation fixing rates makes such rates binding and enforceable, since under Rem. Comp. Stat. Wash. § 10379, Department of Public Works has authority to abrogate and cancel such franchise rates if in proper case it sees fit to do so, an order of the department establishing rates had effect of terminating and abrogating franchise rates, and establishing instead department or statutory rates.

**16. Courts ⟨☞⟩366(1).**

Construction of state statutes by state court of last resort is binding on federal court.

**17. Public service commissions ⟨☞⟩7—Public utility's outlays for reasonable future needs as to equipment is matter of business management, which may not be arbitrarily interfered with under guise of rate making.**

Outlays of public utility companies for equipment in anticipation of reasonable future needs is essentially a matter of business management, which may not be arbitrarily interfered with under the guise of rate making.

**18. Public service commissions ⟨☞⟩7.**

In absence of evidence to contrary, investment by public utilities for future needs may reasonably be assumed to have been made in exercise of reasonable judgment.

**19. Telegraphs and telephones ⟨☞⟩33(1)— Special master's finding that expenditure for switching machine apparatus by telephone company was judicious and proper held correct.**

Finding of special master that expenditure of telephone company for installation of switching apparatus was judicious and proper *held* correct, in view of finding of state department of public works in making previous order that installation was justified.

**20. Telegraphs and telephones ⟨☞⟩33(1)— Complaint that allocation of toll line charges under contract between telephone company grants less to one than cost of service, cannot be considered in suit to enjoin state department's rate.**

Although allocations of toll line charges under contract between telephone companies grant amount to one company substantially less than the actual cost of supplying the service, relief against such situation cannot be granted in suit by telephone company to enjoin enforcing rates set by state department.

**21. Telegraphs and telephones ⟨☞⟩33(1)— Special master's finding that contract for allocation of toll line charges was of benefit to company which received less than cost of service will not be disturbed by federal court.**

Federal court is not justified in disturbing special master's finding that contract allocating toll line charges between telephone companies was of great benefit to company, although it received substantially less than actual cost of service, where such division is the usual and customary method of adjustment adopted by telephone companies.

In Equity. Separate suits by the Pacific Telephone & Telegraph Company against Walter B. Whitcomb, as Director of Public Works of Washington, and others and by the Home Telephone & Telegraph Company of Spokane, against John C. Denney, as Director of Public Works of Washington, and others, consolidated for the purpose of taking testimony before a special master, and considered together. On exceptions to the master's report pursuant to Judicial Code, § 266, as amended. Exceptions overruled, and decree, granting permanent injunction as recommended by special master, entered.

Otto B. Rupp, of Seattle, Wash., Post & Russell, of Spokane, Wash., and Pillsbury, Madison & Sutro, of San Francisco, Cal. (C. M. Bracelen, of New York City, of counsel), for plaintiffs.

John H. Dunbar, Atty. Gen., and H. C. Brodie, Asst. Atty. Gen., of State of Washington (Thomas J. L. Kennedy, of Seattle, Wash., E. K. Murray, of Tacoma, Wash., and Alex M. Winston, of Spokane, Wash., of counsel), for defendants.

Before RUDKIN, Circuit Judge, and NETERER and WEBSTER, District Judges.

WEBSTER, District Judge. These cases, by agreement of counsel consolidated for the purpose of taking testimony before the special master, have been dealt with by him in a single report, and will therefore be considered together. No attempt will be made to detail the history of this complicated and protracted litigation as it has taken its course through state and federal courts. For the purpose of our present inquiries, it will perhaps suffice to say that on March 31, 1923, the Department of Public Works of the state of Washington (hereinafter called the department) made two orders affecting these plaintiffs, one purporting to determine for rate-making purposes the value of the property of the Home Telephone & Telegraph Company of Spokane (hereinafter called the Home Company), and the other a like order fixing the value of both the intrastate and interstate property of the Pacific Telephone & Telegraph Company (hereinafter called the Pacific Company). A few days later these suits were commenced by these two companies, alleging that the rate orders promulgated by the department were confiscatory of the property of the companies, respectively, and consequently in violation of the federal Constitution. The cases are now before the court pursuant to section 266 of the Judicial Code as amended (Comp. St. § 1243), upon exceptions to the report of the special master, to whom the cases were in due course referred.

The special master found the fair and reasonable value of the Pacific Company's intrastate property devoted to the public service, as of June 30, 1922, to be $31,425,-403.75, including average working capital, to which there should be added $720,000, found to be the "going concern value" of that company's property, making a total value or rate basis on which that company was entitled to a fair and reasonable return of $32,145,403.75; and the equivalent figure for the Home Company was fixed at $4,548,-021.76. The special master further found the fair and reasonable rate of return which the companies were entitled to earn as of June 30, 1922, to be 7½ per centum per annum. In addition he found that the net revenue of the Pacific Company as of June 30, 1922, was $928,081.97, and the corresponding figure for the Home Company was $126,081.97, on the basis of the rates then allowed, and that these revenues would produce a return of less than 3 per centum per annum for each company. From these findings he concluded as a matter of law that the effect of enforcing the orders of the department complained of would be to confiscate the property of the companies, respectively, and recommended that a permanent injunction be granted restraining the department from putting such orders into effect. The correctness of these findings and conclusions is now challenged by exceptions, which give rise to the following principal questions:

One. What is the fair and reasonable value of the properties of the two companies respectively which is held for and used in the public service—that is to say, what is the proper value of such properties as the lawful basis for a rate structure?

Two. In determining this, should working capital be allowed?

Three. Should "going concern value" be taken into account, and, if so, how should such amount be ascertained?

Four. What amount should properly be deducted for depreciation, and how is this amount to be arrived at?

Five. Are the licensee contracts involved valid and to be given their face effect?

And finally. What was a proper rate of return to be allowed each company upon the property devoted by it to the public use as of June 30, 1922?

The subordinate and incidental problems to which these major considerations necessarily give rise will be noticed in their proper places and connections.

At the threshold we face the query, What were the physical properties of the companies, respectively, as of June 30, 1922. During 1913, 1914, and 1915, at a cost of approximately $125,000, the Pacific Company made a detailed and complete inventory of all its property in the state of Washington. As to central office equipment, buildings, and certain other important items of property, an actual field count and appraisal was made. In case of other classes of property as careful and accurate a survey was made as the nature of the millions of small items comprising it rendered practicable. This inventory and appraisal consisted of 54 volumes containing an average of 400 pages each. It was completed in the early part of 1915, and subsequently was brought down to December 31, 1921, by a system of accounting supplemented by various and numerous field checks. The work was in charge of an expert in such matters, who testified: "It is as close a determination of the precise

facts as it is humanly possible to make it." There is little in the record challenging the correctness of this appraisal, and the special master was amply justified in finding that it is as accurate, thorough, and complete as it is practical to make it, and is all that should in reason be required. The cost of reproducing the property of the Home Company, with the exception of its going concern value, was stipulated by the parties, and therefore needs no discussion. Taking then the detailed inventory and the stipulation as the basis of the physical properties of the two companies, we pass naturally to the ascertainment of the proper rules to be followed, the proper elements and factors to be considered, in fixing the value of such property for rate-making purposes.

In Smyth v. Ames, 18 S. Ct. 418, 434, 169 U. S. 466, 546, 547 (42 L. Ed. 819) the Supreme Court said:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience."

In Willcox v. Consolidated Gas Co., 29 S. Ct. 192, 200, 212 U. S. 19, 52 (53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. [N. S.] 1134) the Supreme Court said:

"If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase. This is, at any rate, the general rule. We do not say there may not possibly be an exception to it," etc.

In the Minnesota Rate Cases, 33 S. Ct. 729, 762, 230 U. S. 352, 454 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18) this principle is stated:

"The property is held in private owner-ship and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law."

In Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 43 S. Ct. 544, 262 U. S. 276, 67 L. Ed. 981, 31 A. L. R. 807, the Public Service Commission undertook to value the property there involved without according any weight to the greatly enhanced cost of material, labor, and supplies. In reviewing this action, at page 287 (43 S. Ct. 546) of the opinion, the court said:

"It is impossible to ascertain what will amount to a fair return upon properties devoted to public service without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future value made upon a view of all the relevant circumstances is essential. If the highly important element of present costs is wholly disregarded such a forecast becomes impossible. Estimates for to-morrow cannot ignore prices of to-day."

In Bluefield Waterworks & Improvement Co. v. Public Service Commission, 43 S. Ct. 675, 677, 262 U. S. 679, 689 (67 L. Ed. 1176), this language is found:

"The record clearly shows that the commission in arriving at its final figure, did not accord proper, if any, weight to the greatly enhanced costs of construction in 1920 over those prevailing about 1915 and before the war, as established by uncontradicted evidence; and the company's detailed estimated cost of reproduction new, less depreciation, at 1920 prices, appears to have been wholly disregarded. This was erroneous."

Federal and state cases holding to the same view almost without number might be cited. It is true that in the case of Georgia Railway & Power Co. v. Railroad Commission, 43 S. Ct. 680, 262 U. S. 625, 67 L. Ed. 1144, the Supreme Court said:

"The refusal of the commission and of the lower court to hold that, for rate-making purposes, the physical properties of a utility must be valued at the replacement cost less depreciation was clearly correct."

[1] The facts of this case, however, and its subsequent history, clearly indicate that the reason for this statement was that at the time of making the estimation of values the prices prevailing were abnormal or peak prices, which afforded no true or just criterion of reproduction costs under stable or normal economic conditions. Plainly, the

rule of reproduction cost less depreciation is not an invariable and inflexible one, to be arbitrarily applied in all cases without regard to other factors and elements. To be sure, there must be no slavish adherence to it. Like most general rules it has exceptions, limitations, and qualifications, and must always be applied to concrete facts with due regard for the fundamental consideration that the utmost any public utility can rightfully demand at the hands of rate-making bodies is such compensation for the use of its property as will, under all the circumstances existing at the time, be just, both to it and to the public. A careful study of the cases, however, leads unerringly to the conclusion that one of the most important factors, if not the dominant factor, in determining the true basis of rate making for public utilities is the cost of reproduction new less depreciation of the property of the utility devoted to the public convenience, at the time of making the rates, provided such cost fairly reflects normal and stable prices prevailing at the time, and which will with reasonable certainty continue to prevail throughout the period covered by the rates fixed, so far as reasonable human foresight, measuring the future by the present and the past, can determine. This is what the utility is supplying for the public service, and it is this of which it would be unjustly deprived by confiscatory rates, fares, tolls, or charges.

There is practically no controversy concerning the original cost of the properties of the two companies. This item was in effect stipulated by the parties.

[2] The department, in its orders of March 31, 1923, which gave rise to this litigation, took for the basis of its promulgated rates the original cost of the properties to the companies, respectively, and gave no consideration to any other elements or factors of value, this being done on the prudent investment theory, which the decisions of the Supreme Court of Washington seem to hold is the method required by the state statute defining the powers of the department. Pacific Coast Elevator Co. v. Department of Public Works, 228 P. 1022, 130 Wash. 620; State ex rel. Spokane Gas Co. v. Kuykendall, 205 P. 3, 119 Wash. 107. This method of valuation was rejected by the special master. In its stead he applied the rules announced in Smyth v. Ames, supra, as explained and qualified by the later holdings of the Supreme Court, attaching no importance to the factor of the value of stocks and bonds upon the authority of the Minnesota Rate Cases, supra. In so doing he was clear-

ly right. Granting the correctness of the method employed, there is little room for criticism of his calculations and conclusions as to the fair and reasonable value of the properties of the companies. No useful purpose would be served by following the labyrinth of details involved in his extremely burdensome task.

[3] We pass now to the question of depreciation. From the cost of reproducing new the properties of the companies must be deducted depreciation, representing the difference between new property and property in the condition it was at the time of the estimate. How should this be done? In the case of the Home Company the amount of depreciation is stipulated; hence calls for no discussion. The question of depreciation in the case of the Pacific Company presents a more difficult problem. The proper method for determining depreciation seems now quite well settled. In Pacific Gas & Electric Co. v. City and County of San Francisco, 44 S. Ct. 537, 265 U. S. 403, 406 (68 L. Ed. 1075), the Supreme Court said:

"Appellant objects to the application of this method and insists that depreciation should have been ascertained upon full consideration of the definite testimony given by competent experts who examined the structural units, spoke concerning observed conditions, and made estimates therefrom. As these examinations were made subsequent to the alleged depreciation for the definite purpose of ascertaining existing facts, we think the criticism is not without merit. Facts shown by reliable evidence were preferable to averages based upon assumed probabilities."

[4] In other words, it was held that accrued depreciation is to be ascertained by an inspection of the property—by going and looking at it and making estimates based upon the facts which such examination discloses. To the same effect, see New York Telephone Co. v. Prendergast (D. C.) 300 F. 822; Southern Bell Telephone & Telegraph Co. v. Railroad Commission (D. C.) 5 F.(2d) 77; Westinghouse Electric & Mfg. Co. v. Denver Tramway Co. (D. C.) 3 F.(2d) 285; Landon v. Court of Industrial Relations (D. C.) 269 F. 433.

On the question of depreciation, the companies produced witnesses Blanck and Fleager, while the defendants called on this point witnesses Hill, Wray, and Green. The special master, with commendable painstaking and scrutiny, examined the conflicting evidence, and concluded that the testimony of witnesses Blanck and Fleager, in view of

their superior experience and opportunities, and notwithstanding the fact that they were employees of the Pacific Company, was the more satisfactory, convincing, and dependable. The record convinces us that he was justified in taking this view of the matter. To undertake to fortify this conclusion by minute analysis of the voluminous record would but serve unduly to lengthen this opinion without giving it added value.

[5, 6] It seems plain from the record, and the special master so found, that the 3½ per centum per annum of the depreciable property of the companies fixed by the department was not sufficient to take care of the actual depreciation which was bound to occur, and was intentionally fixed at a lesser amount for the purpose of reducing what it conceived to be an excessive depreciation reserve fund. Such a method finds little support in law or reason. The depreciation to be taken into account in ascertaining the rate base is that diminution in the value of the property involved which takes place in the physical thing, and is ascertained by a physical inspection of it—not the future depreciation which inevitably comes about by wear, tear, obsolescence, and the like. The ascertainment of the amounts necessary for the latter purpose sheds no light on the present value of the properties of the companies for the purpose of present rate making. Indeed, it was not fixed by the department for any such purpose. The precise question of whether it is permissible for a rate-making body to reduce what it considers an excessive depreciation reserve fund by making inadequate provision for future depreciation was considered in New York Telephone Co. v. Board of Public Utility Commissioners (D. C.) 5 F.(2d) 245, and the practice was condemned.

[7] The amount of average working capital of both companies was stipulated by the parties, and was properly taken into account by the special master under the authorities already cited.

[8] In the hearing before the special master, it was not disputed that, in a case presenting proper proof thereof "going value," "going concern value," or "value of plant in successful operation" (which are synonymous terms), should be taken into account. The special master aptly defines this item in the following language:

"This is the additional value that a purchaser will give for the properties and business of the companies because they are going concerns with established businesses. * * * This additional value, over and above the fair and reasonable value of the physical properties plus the working capital, which a customer would pay for the property because it is a going concern and which additional value we call 'going value,' does not depend upon past losses in operations, successfully survived, or in expenditures, wise or unwise, during development. There may be such a thing as expenditures wisely made, contributing to 'going value,' but they are not the measure of the amount of 'going value.'"

[9, 10] He studiously avoided making any allowance for development cost, and likewise repudiated the theory of capitalization of the net balance of alleged past deficits. He rightly held that this item of value rests largely in competent or expert opinion, and accepted in the case of the Pacific Company the amount testified to by the defendants' expert, Mr. Green. Under the authorities there can be little doubt as to the correctness of his action in this respect. As to the amount allowed, the defendants' view was accepted, and they are in no position to complain. For cases discussing going value and the propriety of its allowance as an intangible part of the rate base, see Galveston Electric Co. v. Galveston, 42 S. Ct. 351, 258 U. S. 388, 66 L. Ed. 678; Houston v. Southwestern Bell Telephone Co., 42 S. Ct. 486, 259 U. S. 318, 66 L. Ed. 961; Georgia Railway & Power Co. v. Railroad Commission, 43 S. Ct. 680, 262 U. S. 625, 67 L. Ed. 1144; Mobile Gas Co. v. Patterson et al. (D. C.) 293 F. 208; Pacific Gas & Electric Co. v. San Francisco D. C.) 273 F. 937. In the case of the Home Company, for want of proper proof, no allowance of going concern value was made.

We pass now to a consideration of the licensee or so-called 4½ per cent. contracts. These are contracts whereby the Pacific Company and the Home Company pay to the American Telephone & Telegraph Company 4½ per cent. of the gross revenues of the companies, respectively, for which the American Company supplies to the Pacific Company and the Home Company certain instrumentalities, appliances, patents, and services, not necessary to detail. The department, in its orders of March 31, 1923, held that these contracts were wrong in principle and contrary to public policy, and substituted, in lieu of the percentage of revenue payment as provided in the contracts, an annual per station charge of 90 cents. The special master took proof touching the validity of these contracts, and found as a fact that they were of great val-

ue to the Pacific and Home Companies as well as to the public, and were not contaminated with fraud or bad faith. As a matter of law he concluded that they were valid obligations, and the amounts paid under them lawful expenditures. As we read the cases, the question presented by this aspect of the case has been foreclosed by the Supreme Court. In Houston v. Southwestern Telephone Co., 42 S. Ct. 486, 488, 259 U. S. 318, 323 (66 L. Ed. 961) the court said:

"The American Telephone & Telegraph Company owns substantially all of the stock of the company and a large majority of the stock of the Western Electric Company. From the American Telephone & Telegraph Company the company leases its instruments and secures their maintenance and renewal, and from the Western Electric Company it obtains the greater part of its equipment and supplies used in operating its local exchange. It is contended by the city that no fair disclosure was made of the profits made by the furnishing companies on the instruments and on the material and supplies so furnished, and that, for this unique reason, the company should not be heard in a court of equity and the case should be dismissed. It is true that the company did not introduce proof to show what the profits of the two companies were, either upon the business done with it or on their entire business, but it did introduce much evidence tending to show that the charge made and allowed for the services rendered and supplies furnished by them was reasonable and less than the same could be obtained for from other sources. Under the circumstances disclosed in the evidence, the fact that the American Telephone & Telegraph Company controlled the company and the Western Electric Company by stock ownership is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the company, but the court recognized and applied this rule. Here again, the evidence introduced by the city was meager and indefinite, while that of the company was exceptionally full and complete, and both contentions must be denied."

Again, in State of Missouri ex rel. v. Public Service Commission, 43 S. Ct. 544, 546, 262 U. S. 276, 288 (67 L. Ed. 981, 31 A. L. R. 807), in dealing with these contracts the court said:

"The important item of expense disallowed by the commission—$174,048.60—is 55 per cent. of the 4½ per cent. of gross revenues paid by plaintiff in error to the American Telephone & Telegraph Company as rents for receivers, transmitters, induction coils, etc., and for licenses and services under the customary form of contract between the latter company and its subsidiaries. Four and one-half per cent. is the ordinary charge paid voluntarily by local companies of the general system. There is nothing to indicate bad faith. So far as appears, plaintiff in error's board of directors has exercised a proper discretion about this matter requiring business judgment. It must never be forgotten that, while the state may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in State Public Utilities Commission ex rel. Springfield v. Springfield Gas & Electric Co. [125 N. E. 891, 901] 291 Ill. 209, 234: 'The commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers.'"

For additional cases to the same effect, see State v. Southwestern Bell Telephone Co., 223 P. 771, 115 Kan. 236; Indiana Bell Telephone Co. v. Public Service Commission (D. C.) 300 F. 190; Chesapeake & Potomac Telephone Co. v. Whitman (D. C.) 3 F.(2d) 938; Southern Bell Telephone & Telegraph Co. v. Railroad Commission (D. C.) 5 F.(2d) 77; Northwestern Bell Telephone Co. v. Spillman (D. C.) 6 F.(2d) 663; Cincinnati v. Public Utilities Commissioners (Ohio) 148 N. E. 817.

[11] An examination of the foregoing cases leaves no doubt as to the validity of these contracts, and that the amounts paid under them are properly chargeable to operating expenses.

[12] At this point it seems convenient to consider the contention of counsel that the Pacific and Home Companies are bound by the orders of the department entered on March 31, 1923, because in the case of the Pacific Company it did not appeal to the state courts as provided by the state statute, and in the case of the Home Company it did not prosecute its appeal in time. Prior to March 31, 1923, however, the Supreme Court of Washington had construed the state statute as meaning that, in fixing valuations for rate purposes, the department should not recognize the theory of repro-

duction new less depreciation, but was confined to the cost method prescribed by the statute. State ex rel. City of Spokane v. Kuykendall, 205 P. 3, 119 Wash. 107. And on September 22, 1924, subsequent to the orders complained of, in Pacific Coast Elevator Co. v. Department, 228 P. 1022, 130 Wash. 620, this holding was approved and redeclared. It is obvious therefore that an appeal to the state courts by the companies would have been an idle and useless formality. Moreover, the plaintiffs here are seeking relief against the orders of the department upon the ground that such orders are confiscatory, and therefore in violation of the federal Constitution. In such a case it is clear that the federal tribunals are not bound by the action of the state department, but it is their imperative duty to exercise an independent judgment on both law and facts. It has been pointedly so held in a number of cases. Bluefield Co. v. Public Service Commission, 43 S. Ct. 675, 262 U. S. 679, 67 L. Ed. 1176; Ohio Valley Water Co. v. Ben Avon Borough, 40 S. Ct. 527, 253 U. S. 287, 64 L. Ed. 908; Monroe Gaslight & Fuel Co. v. Public Utilities Commission (D. C.) 292 F. 139; Van Wert Gaslight Co. v. Public Utilities Commission (D. C.) 299 F. 670.

[13] With respect to the question of the proper rate of return to be taken into consideration in determining whether the orders of the department complained of are confiscatory, the special master concluded that a return of less than 7½ per centum upon the fair value of the property, plus working capital and going concern value, would be confiscatory. The principles to be applied in determining what constitutes a confiscatory rate are stated by the Supreme Court in the Bluefield Case, supra, as follows:

"What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market, and business conditions generally."

After reviewing former decisions of the courts dealing with the question, the court uses this language:

"Investors take into account the result of past operations, especially in recent years, when determining the terms upon which they will invest in such an undertaking. Low, uncertain, or irregular income makes for low prices for the securities of the utility and higher rates of interest to be demanded by investors. The fact that the company may not insist as a matter of constitutional right that past losses be made up by rates to be applied in the present and future tends to weaken credit, and the fact that the utility is protected against being compelled to serve for confiscatory rates, tends to support it."

The conclusion reached was that a rate of return of 6 per centum upon the value of the property was substantially too low to constitute just compensation for the use of the property employed in rendering the public service. This opinion was handed down June 11, 1923. In the Southwestern Bell Telephone Co. Case, 43 S. Ct. 544, 546, 262 U. S. 276, 288 (67 L. Ed. 981, 31 A. L. R. 807), decided May 21, 1923, the Supreme Court said:

"That 6 per cent. should be allowed for depreciation appears to be accepted by the commission. Deducting this would leave a possible 5⅓ per cent. return upon the minimum value of the property, which is wholly inadequate considering the character of the investment and interest rates then prevailing."

[14] In Pacific Gas & Electric Co. v. City and County of San Francisco, 44 S. Ct. 537, 265 U. S. 403, 68 L. Ed. 1075, decided June 2, 1924, the master in chancery had held that any rate of return less than 7 per centum would be confiscatory. In reviewing this point, at page 405 (44 S. Ct. 537), the Supreme Court said: "We think the evidence supports the finding that a net return of 7 per centum was necessary in order to avoid confiscation." In Consolidated Gas Co. v. Prendergast (D. C.) 6 F.(2d) 243, Judge

Winslow upheld a rate of 8 per cent. In Kings County Lighting Co. v. Prendergast (D. C.) 7 F.(2d) 192, a statutory three-judges court made up of Judges Manton, Campbell and Inch, approved a rate of 8 per cent. In Indiana Bell Telephone Co. v. Public Service Commission (D. C.) 300 F. 190, a rate of 8 per cent. was sustained. In State v. Southern Bell Telephone Co., 223 P. 771, 115 Kan. 236, the Supreme Court of Kansas upheld a rate of 8 per cent. We have noticed these cases particularly for the purpose of showing the trend of thought touching this matter, as disclosed by the latest expressions of the courts in various parts of the country. There was competent and reliable evidence amply supporting the conclusion of the special master. The proper principles, as defined by the courts, were applied, and the figure fixed by him was within the limits marked by the controlling cases. Moreover, this court is not engaged in the task of fixing rates for public utilities, and, even if it be thought that the rate of return fixed by the special master is excessive, it is obvious that, measured by a substantially lower rate of return, the orders of the department here under review would nevertheless be confiscatory, because of the improper rate base adopted by the department.

[15] In behalf of the cities of Seattle, Tacoma, and Spokane, it is contended that the plaintiff companies are entitled to no relief because in these cities the companies were operating under franchises which prescribed rates substantially lower than those allowed by the department, and that the franchise rates are controlling, particularly since the department did not expressly and in pointed terms abrogate and cancel them. It cannot be doubted that where a franchise contract is entered into between a municipality and a public utility corporation fixing rates to be charged by the latter for a not grossly unreasonable period of time, such rates are binding and enforceable, even though confiscatory of the property involved. St. Cloud Public Service Co. v. City of St. Cloud, 44 S. Ct. 492, 265 U. S. 352, 68 L. Ed. 1050. Nor can it be doubted that under the statutes of the state of Washington the department has the power to abrogate and cancel such franchise rates if in a proper case it sees fit to do so. Section 10379 of Remington's Compiled Statutes of Washington provides:

"Nothing in this act shall be construed to prevent any telegraph company or telephone company from continuing to furnish the use of its line, equipment, or service under any contract or contracts in force at the date this act takes effect or upon the taking effect of any schedule or schedules of rates subsequently filed with the commission, as herein provided, at the rates fixed in such contract or contracts: Provided, however, that the commission shall have power, in its discretion, to direct by order that such contract or contracts shall be terminated by the telephone company or telegraph company party thereto, and thereupon such contract or contracts shall be terminated by such telephone company or telegraph company as and when directed by such order. L. 1911, p. 567, § 43."

Construing this statute in the case of State ex rel. Spokane v. Kuykendall, 205 P. 3, 4, 5, 119 Wash. 107, 111, 112, the Supreme Court of Washington said:

"By the act of 1911 (Laws of 1911, p. 551, § 34) the terms of a franchise contract like the one in question here are binding upon the parties until the Department of Public Works (heretofore the Public Service Commission) has made an order directing a departure therefrom; and, without question, the department has the right and power to order a departure. State ex rel. Ellertsen v. Home Tel. & Tel. Co., 172 P. 899, 102 Wash. 196. In the case of State ex rel. Webster v. Superior Court, 120 P. 861, 67 Wash. 37, L. R. A. 1915C, 287, Ann. Cas. 1913D, 78, it was decided that the Public Service Commission law place the entire subject of rate regulation under the control of the commission, that no contract between a city representing the public and a public service company would be allowed to interfere with that control, and by way of application of the rule, it was decided in that case to be the duty of the commission to the company to fix a rate which was sufficient (a rate that would afford a fair interest return on the investment), in spite of the franchise contract fixing rates which were too low. That, in legal effect, is what has been done in the present case."

In this same case the point was urged that the department, in fixing the new rates, did not in express terms cancel and terminate the franchise rates. Answering this contention, the court said:

"The present order of the Department of Public Works is just as effective as if, after fixing the rates, there had been added therein the words, 'and it is hereby directed that the rates provided in the franchise shall be and they are hereby terminated,' or words of similar import. That is the legal effect of

what was done, and the form or language by which it was accomplished is not very material."

[16] This holding is the construction of a state statute by the court of last resort of the state, and consequently is binding upon this court. The special master concluded that the order of the Public Service Commission (now the Department of Public Works) entered on August 8, 1919, and after the termination of federal control of the properties, continuing in effect the rates established by the Postmaster General so far as the Pacific Company is concerned, and the orders of the department to the same effect entered on March 31, 1923, as to both the Pacific and the Home Companies, had the effect of terminating and abrogating the franchise rates, and that the rates established by the department in their stead became "department" or "statutory" rates, as distinguished from "franchise" or "contract" rates. In this we agree with him. State ex rel. Spokane v. Kuykendall, supra. It may be conceded that the department was not obliged to grant any relief against the rates stipulated in the franchises, and that it could not by judicial action be compelled to do so. Yet, if it undertakes to terminate such rates pursuant to its plain statutory powers, the rates substituted instead must be fair, just, and reasonable, if the plain mandate of the statute defining its duties is to be obeyed. And, when the substituted rates are challenged, they must be considered as statutory—not franchise—rates, and their character as being confiscatory or not must be measured by the principles of law applicable to such rates.

[17-19] Vehement attack is made upon the Pacific Company's investment in switching machine apparatus for use in the city of Seattle. It is asserted that the outlay was unnecessary, unreasonable, and injudicious. The department, in its Pacific Company order of March 31, 1923, expressly found "the installation of machine switches in Seattle is justified." There is no evidence in the record which would warrant a contrary conclusion. Seattle is a progressive and rapidly growing city. Utilities which are equal to its present requirements may be grossly inadequate in the reasonably near future. Public service companies cannot wait until their facilities break down or prove unequal to the demands upon them before making needful additions and improvements. Business judgment must be employed to anticipate reasonable future needs and to make

provision for them in advance. This is essentially a matter of business management which may not be arbitrarily interfered with. There is nothing in the outlay to suggest dishonest, wasteful, or imprudent expenditure. The right of a public utility corporation honestly and in good faith to carry on its business and direct its affairs must not be wrested from it under the guise of rate making. In the absence of evidence to the contrary, investments may reasonably be assumed to have been made in the exercise of reasonable judgment. Missouri ex rel. v. Public Service Commission, supra. See, also, Northwestern Bell Telephone Co. v. Spillman (D. C.) 6 F.(2d) 663. The finding of the special master that this expenditure was judicious and proper is clearly right.

[20, 21] Counsel for the city of Spokane, with great earnestness, complains of the allocation of toll line charges under a contract between the Home Company and the Pacific Company. It is conceded that the amount received by the Home Company is substantially less than the actual cost of supplying the service. It is therefore contended that the arrangement is unconscionable. It is not apparent to us, however, how relief against that situation may be granted in this case. It appears, nevertheless, that contracts of the same kind—and in fact contracts less favorable to the small companies—are readily entered into all over the country by telephone companies, including independent as well as subsidiary companies. That such a division of the joint tolls, in spite of superficial appearances to the contrary, is not unwise or unconscionable would seem to be sustained by the fact that it embodies the customary and usual method of adjustment adopted by the parties, dealing in the light of practical experience in such matters. City of Houston v. Southwestern Bell Telephone Co., 42 S. Ct. 486, 259 U. S. 318, 322, 66 L. Ed. 961. The special master found that, in view of all the pertinent considerations the contract was of great benefit to the Home Company and its patrons. We do not feel justified in disturbing that finding.

For the foregoing reasons, the exceptions to the report of the special master will be overruled, and the permanent injunction recommended by him will be granted. A decree accordingly may be presented. Before finally passing the decree, the amount of the allowance to cover the services of the special master will be determined.