INTERNATIONAL RY. CO. v. PRENDERGAST et al.

District Court, W. D. New York.
Oct. 11, 1932.

See, also, (D. C.) 29 F.(2d) 296; (D. C.) 52 F.(2d) 293.

Henry W. Killeen and James C. Sweeney, both of Buffalo, N. Y., and Coleman J. Joyce, of Philadelphia, Pa., for plaintiff.

Charles G. Blakeslee, of Albany, N. Y. (Russell B. Burnside, of Albany, N. Y., and George E. McVay, of Huguenot Park, S. I., N. Y., of counsel), for defendant Public Service Commission.

Charles L. Feldman, Corp. Counsel, of Buffalo, N. Y. (Frank C. Laughlin, of New York City, and Frederic C. Rupp, Jeremiah J. Hurley, and Fred C. Maloney, all of Buffalo, N. Y., of counsel), for defendant City of Buffalo.

Before MANTON, Circuit Judge, and ADLER and KNIGHT, District Judges, constituting a statutory court, convened pursuant to section 266 of the Judicial Code, as amended (28 USCA § 380).

MANTON, Circuit Judge.

The plaintiff moves for a confirmation of the master's report in this suit seeking relief from a claimed confiscation of its street railway property by reason of the rate of fare it is permitted to charge for carrying passengers in the city of Buffalo. It is a street railway corporation organized under the New York state law, subject to the supervision and regulation of the Public Service Commission (chapter 480, Laws of 1910 (Consol. Laws N. Y. c. 48) amending chapter 429 of the Laws of 1907). It operated a street railway system in the cities of Buffalo, Niagara Falls, and Lockport; a line in the Dominion of Canada; an interurban electric line for the transportation of passengers between Buffalo and Niagara Falls, and Buffalo and Lockport, passing through Tonawanda and North Tonawanda, and from Lockport to Olcott and Olcott Beach; and it operates, outside the corporate limits of Buffalo, a River Road line providing transportation for some industrial plants. It also owns and operates two international bridges over Niagara Falls and electric railway lines over the bridges and in Victoria Park and in the villages of Chippewa and Queenston, Ontario, Canada.

At various times, pursuant to the Public Service Commissions Law, the commission allowed schedules fixing rates of fares upon plaintiff's lines. On September 16, 1926, plaintiff filed schedules with the commission increasing its rates in Buffalo to a 10-cent cash fare and 5 cents for children. On November 16, 1926, while the hearings were in progress before the commission, the plaintiff filed this bill alleging confiscation, serving its papers in December, 1926. After the commencement of the suit, the commission, by order, permitted the plaintiff to put into effect its proposed fares in the cities of Lockport, Tonawanda and North Tonawanda and on its interurban lines.

By an order of June 8, 1927, effective July 1, 1927, rates of fares in the city of Buffalo were increased to 10 cents or three tokens for 25 cents, each token being good for one continuous ride. These rates are now in effect in the city of Buffalo. Thereupon the plaintiff was permitted to file a supplemental bill in September, 1928, charging that the last rates so fixed by the Public Service Commission were confiscatory. The District Court on April 3, 1929, entered an order requiring that a bill of particulars be furnished to the defendants making a segregation of the plaintiff's properties, revenues, and expenses in the cities of Buffalo and Niagara Falls and the village of Lancaster, reserving its right to claim that all its properties were used and useful in public service and constituted one system and should be so regarded for the purpose of determining whether or not the plaintiff's property was being confiscated.

The plaintiff moved for a temporary injunction, which was denied by this court on May 22, 1930, 52 F.(2d) 293, 298, at which time we said: "In view of this sharp contradiction as to valuations, operating expenses, and earnings, the temporary relief asked for will be denied. A master will be appointed, who will give assurance of prompt disposition of the issues raised by the parties by sitting continuously in hearing the testimony and the respective contentions. It will be a more just guide to ascertain the correctness of the plaintiff's claim of confiscation."

The master filed his report two years later, which was not responsive to the suggestion of promptness of this court.

During the progress of the proceeding, plaintiff entered into a contract with the city of Niagara Falls agreeing to an 8-cent fare

with two tokens for 15 cents, and this met with the approval of the commission. The lines in the village of Lancaster were abandoned. Therefore, the only question remaining for the master was whether the rate of fare in the city of Buffalo, a charge of 10 cents cash, three tokens for 25 cents, with a 3-cent fare to children, as enforced, resulted in confiscation of plaintiff's property.

Many questions were considered by the master in reaching his conclusion that the rate of fare charged was confiscatory. Some of these are here for review and necessarily affect the principal question. The master held that in view of the fact that all the fares questioned had been settled, except that of the city of Buffalo, by agreement of the parties with the approval of the commission, in reaching a fair valuation of the property devoted to this service only the reproduction costs new, operating expense, and returns from the city of Buffalo transportation should be considered. He concluded that the rate of return on the fair valuation of the property used in service in Buffalo, 6.73 per cent. in 1928, 6.3 per cent. in 1929, and 5.82 per cent. in 1930, was inadequate and confiscatory under the authority of United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390.

The commission fixed a new rate base for Buffalo in September, 1926, of $23,261,558.-09. It is upon this basis that it increased the fare to 10 cents cash, three tokens for 25 cents, on July 1, 1927. It found that on the operating revenue of $8,903,304.39 the rate of fare as above stated should be allowed.

The master found that the plaintiff gave this increased rate of fare a fair trial before it moved for leave to file its supplementary bill of complaint attacking the new rate of fare as confiscatory. The master found that the rate base of the property used and useful in this service for 1928, 1929, and 1930 was not less than $25,541,147.50 and that the property used and useful for the transportation of passengers in its entire system during the same period of time was and is of the fair value of not less than $40,425,515.72.

The plaintiff contends that its entire system should be included in considering the claim of confiscation. But only the rates to be charged in the city of Buffalo are now in controversy, and we think the master was right in treating the Buffalo system as a separate unit of operation. The commission had theretofore treated the system in like manner, with the plaintiff's acquiescence. The master did include the River Road line, connected with the Buffalo system. It serves, principally, industrial plants just outside of the corporate limits and in the town of Tonawanda. Its value was fixed at $145,000—an inconsequential sum in view of the concededly large valuation. The opinion of the master sets forth cogent and sufficient reasons leading to this conclusion. It meets with our approval and is justified by the authorities. Gilchrist v. Interborough Rapid Transit Co., 279 U. S. 159, 49 S. Ct. 282, 73 L. Ed. 652; Chicago, M. S. & P. R. Co. v. P. U. Comm., 274 U. S. 344, 47 S. Ct. 604, 71 L. Ed. 1085; Ohio Utilities Co. v. Public Utilities Comm., 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656; Minnesota Rate Case 1913, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

The master found the reproduction cost new and the depreciation of the property in the city of Buffalo. He found a depreciation sum of $6,630,651. Considering the revenues and operating expenses, the master found the rate of return as stated above. The rates of return on these figures are inadequate. United Rys. & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390.

The master has exhaustively examined the evidence adduced before reaching these conclusions, and has sustained the plaintiff's contention of confiscation.

We need but examine his consideration as to depreciation deducted, going concern value allowed, and the effect of these upon his conclusion in fixing the rate base. We must also consider the effect of the bus competition created by the plaintiff in embarking on the transportation of passengers by motorbus in the city of Buffalo; also the question argued as to the claimed effect resulting in a decrease of passengers, due to increasing the rates of fares.

### Depreciation.

The depreciation to be considered in determining the fair value for rate-making purposes has had consideration upon two theories. One, the depreciation to be subtracted from reproduction cost new is the deferred maintenance; that is, the expenditure necessary to make the utility considered as a single service unit as efficient in rendering service as a plant reproduced new. This has been referred to as a "deferred maintenance theory." The other, supported by the public authorities regulating utilities, that depreciation is the amount that each physical unit of property such as rails, street cars, or power house has lost in its total service life through the passage of time and action of the

elements, use, and obsolescence. Each item of physical property is considered as a separate unit possessing a service life. The amount which this service life has been consumed is depreciation. This is referred to as the "service life theory." See the dissenting opinion of Mr. Justice Brandeis in United Rys. & Elec. Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390. The master in his report, states: "His own opinion predicated upon all of the evidence as to what the reproduction cost new would be (exclusive of said general overheads), and as to what should be deducted from that cost because of observed depreciation * * *." His conclusions fixed the depreciation on an average of about 25 per cent. of the reproduction cost new as he found that sum to be.

It is objected by the defendants: First, that the master does not state which theory he adopted, "service life theory" proposed by the defendants, or the "deferred maintenance theory" proposed by the plaintiff; second, that the master does not set forth his mathematical or mental process by which he calculated depreciation; third, that the plaintiff's evidence of deferred maintenance of $1,980,555 was not acceptable as evidence of depreciation, nor was the master justified in rejecting the defendants' evidence of depreciation which was the total sum of $10,569,-000; fourth, that it was error for the master to find depreciation on each account to be a straight percentage of reproduction cost new of the property as set forth in each account.

The plaintiff contends that the depreciation is the actual loss or impairment of value, if any, of the property considered as one instrument of service and, it argues, that the property should be examined in its several parts, and if in any part there be a deficiency which results in the impairment of the ability of the property to function, the cost of remedying the deficiency by replacing the unit with another, sound and sufficient, should be estimated and, the argument proceeds, that in that case there would be no unsound or insufficient unit if all replacements were made when replacements are due. The failure to keep the property in appropriate operating condition by proper repair and proper replacement is a failure of maintenance, or a deferring of maintenance and the condition is called a condition of deferred maintenance. The total cost of the delayed repairs and of overdue replacement is the measure of depreciation.

The defendants' claims are that the depreciation is to be determined by examination of each unit of property to ascertain how long each unit has been in service. An estimate of how much longer each unit will continue to be of service is then made, and by adding together the two periods of time the useful life of each unit is obtained. Depreciation is then determined by attributing to this useful life a value of 100 per cent.; by determining the part or portion of 100 per cent. which has expired and by taking as depreciation the percentage thus obtained and applying it to the reproduction cost new. By this method it is assumed that when the property is new it is worth reproduction cost, and that when it is placed in service it begins to deteriorate in value and continues proportionately to its lapsed life. The depreciation is the departure from physical condition new. The percentage of depreciation from actual newness is also the percentage of loss of value of the unit to be applied to reproduction cost new.

■ The defendants have offered evidence of experts to support their figures on depreciation. The table as submitted was not accepted by the master who concluded, without evidence to support them, upon lower percentages of depreciation. He found the sum to be $6,630,651. Both plaintiff and defendants criticize this result. In support of the master it can be said that he refuses the defendants' higher percentages as his guide. He was not obliged to accept defendants' higher percentages, as testified to by the witnesses. But his findings should be supported by some evidence. We are unable to find support in the testimony justifying this reduced sum of depreciation which necessarily must be based on the service life theory and not the deferred maintenance theory of the plaintiff.

■ The master does not state which theory of depreciation he followed. The record is without evidence to justify an average of 25 per cent. of reproduction cost new for depreciation. Depreciation allowances in cases where it does not appear that the master proceeded upon one theory or the other have been approved. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; United Rys. & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390. Depreciation, like fair value, is a question of fact to be determined in each case on all the evidence. Which theory—deferred maintenance or service life—should be followed has not been squarely raised in the Supreme Court. See dissenting opinion of Mr. Justice Brandeis in United Rys. & Elec. Co. v. West, supra. But the courts have insisted

that there be evidence to support the value accepted as the depreciation in determining the rate base. The service life theory as a rule of law in determining depreciation would seem to give more accurately and truly the valuation. Deferred maintenance is not depreciation and does not satisfy the rule of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 150, 53 L. Ed. 371, which requires depreciation to be deducted. In the Knoxville Case, the court refers to depreciation "which has come from age and use."

In the Minnesota Rate Case 1913, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the court says that depreciation must be computed, but does not state how it must be computed. In Galveston Elec. Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678, the court refers to three separate accounts, as depreciation, maintenance, and deferred maintenance. There it was pointed out that the court below did not err in allowing both a maintenance deduction and also a separate depreciation deduction. The claim of the company for a deferred maintenance deduction was rejected as an attempt to capitalize past losses. Since maintenance is distinct from depreciation and the rule requires depreciation to be deducted, the deferred maintenance theory did not satisfy in the Knoxville or Minnesota Rate Cases.

In Pacific Gas & Electric Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075, the court approved the use of the sinking fund method of estimating service life of different structural units and the case clearly approves the service life theory. It is true that in United Rys. & Elec. Co. v. West, 280 U. S. 234, 253, 50 S. Ct. 123, 126, 74 L. Ed. 390, the court said that there should be deducted that amount "necessary to restore property worn out or impaired, so as continuously to maintain it as nearly as practicable at the same level of efficiency for the public service." It seems to recognize the deferred maintenance theory in this phrase. But it is said (page 254 of 280 U. S., 50 S. Ct. 123, 126) that present value, which is the basis of depreciation, calls for "expenditures equal to the cost of the worn-out equipment at the time of replacement." This reference to replacement seems to refer to the service life theory. The West Case came to the Supreme Court from the Court of Appeals of Maryland. Public Service Commission v. United Railway & Electric Co., 155 Md. 572, 142 A. 870. There the court rejected the depreciation figure based on a percentage of the gross income and stated that an estimate should be based in part at least upon an investigation of the probable useful life of the property. See, also, Id., 157 Md. 70, 145 A. 340. This language seems to have in mind the service life theory. New York Tel. Co. v. Prendergast (D. C.) 36 F. (2d) 54.

It would have been better practice for the master to have set forth his calculations in arriving at the allowed depreciation. A conclusion based upon "all the evidence," which is the decision of the master, and based upon no calculation, may not be accepted, particularly in view of the fact that we find no evidence justifying the figure arrived at by the master. Even if the plaintiff's evidence is excluded, the master would have been justified in accepting the lower final figures of the defendant. Brooklyn Union Gas Co. v. Prendergast (D. C.) 7 F.(2d) 628; New York & Richmond Gas Co. v. Prendergast (D. C.) 10 F.(2d) 167. The burden of proof was on the plaintiff to establish depreciation by showing it with reference to each unit referred to in the many accounts submitted to the master and his conclusion must be based on some evidence. Ohio Utilities Co. v. Public Utilities Comm., 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656; Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908.

Moreover, it appears that the master has applied straight whole number percentages to reproduction cost to obtain depreciation, except in accounts 521 and 540, has multiplied the several accounts by depreciation percentages and has obtained the exact amount of depreciation in dollars by this method. This suggests that the amount of depreciation was obtained from the percentages and not the percentages computed after the amounts of depreciation were estimated. In the absence of some statement as to how the calculations were arrived at by the master, the inference is strong that the master did not estimate or calculate these percentages, but chose them by some process which is not disclosed. This method of obtaining value by choosing some straight percentage of the value of physical property has been held to apply to going value and overheads, but it is an incorrect method of assigning value to depreciation. It should be discouraged, particularly where there was an actual estimate of depreciation on the several units referred to in the accounts. Fully recognizing that the findings of fact reported by the master are presumptively correct, they are

nevertheless subject to review by the court on motion for confirmation, which is not a trial de novo. Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649; Kimberly v. Arms, 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764; Equity Rule 61½, U. S. Supreme Court, 52 S. Ct. xxxiv (28 USCA § 723).

Accepting the proof offered by the defendants as to depreciation on the theory of service life, the rate of return on the fair value of the property found to be used and useful in the service, considering the expenses of operation and the revenues, would be 7.96 per cent. for 1928; 7.46 per cent. for 1929, and 6.88 per cent. for 1930. Such evidence of depreciation is the only evidence we have to aid us. Moreover, we think it trustworthy. Such rates of return, for at least two years, is sufficient, and while 1930 fell below that considered to be confiscatory in United Rys. & Elec. Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390, the two preceding years would fall within the rule declaring such return to be sufficient and nonconfiscatory.

## Going Value.

The plaintiff presented a claim for going value equal to 15 per cent. of the present value of its property. Its expert testified that this going value, allocated to the city of Buffalo, cost $6,545,042. It consisted of items of cost of trained personnel, acquisition of records and schedules, cost of superseded property, and acquisition of patronage. The defendants' answer denied the right to valuation for going value but offered no evidence. They contend that plaintiff's evidence does not prove going value. They say that the plaintiff attempted to capitalize plaintiff's losses or to capitalize sums allocated under the uniform system of accounting to operating expenses. They argue that the plaintiff's property has no going value because of the dilapidated and worn-out condition of its property and its disfavor with the public. The master in his report states briefly that going value must be allowed and says that an analysis of the large number of cases shows allowances from 5.7 per cent. to 15 per cent. and then states an allowance of 10 per cent. of the present value of the physical property.

In determining the rate base for a utility, the value of the tangible and intangible properties must be found. One of the most elusive of the intangible properties is going value. It is difficult of computation, for it offers no basis for even a rough esti-

mate of its value, but constitutional protection against confiscation gives a real substance to this intangible property. Going value of a utility is its value as an operating plant in a business engaged in making profit over and above the value of that same plant not in operation. In obtaining reproduction cost new, the value of the business as complete and ready to begin operation is ascertained. There must be added a going value, the value of the plant, not as it is ready to begin operation, but the additional value which accrues because the plant is in operation with customers acquired. A proper method of analysis is to consider what capital expenditures would be required to transfer the utility reproduced and ready to begin operations into the utility actually operating at its present normal rate. What covers expenditures which are necessary to acquire patronage, trained personnel, records, and schedules of operations, is the question. What sum represents maintenance, depreciation, taxes, and interest on the property reproduced between the time it is ready to operate and the time it reaches normal operation? These are the factors of going value.

In estimating going value, it is essential to refrain from charging expenditures which are properly chargeable to other accounts used in finding the rate base. Expenditures properly allowed by the commission regulating utilities as operating expenses must not be capitalized as going value. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Galveston Elec. Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; City of Omaha v. Omaha Water Co., 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371; New York Tel. Co. v. Prendergast (D. C.) 36 F.(2d) 54; Nat. Waterworks Co. v. Kansas City, 62 F. 853 (C. C. A. 8). The authorities support the rule that going value must be allowed, but in the application of the rule confusion has resulted. Some practical guides, however, are found. The practice of allowance of straight percentage of value of physical properties for going value is not justified because there is no necessary relation between value of physical properties and going value and the percentage allowed in the one case may be no guide to the percentage allowed in another. However, straight percentages were allowed in the following cases: McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Columbus Gas &

Fuel Co. v. Columbus (D. C.) 17 F.(2d) 630; Bluefield Water Works & Imp. Co. v. Public Service Comm., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Michigan Bell Tel. Co. v. Odell (D. C.) 45 F.(2d) 180; Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Comm. (D. C.) 11 F.(2d) 319.

 An actual estimate of going value was followed in Southwestern Bell Tel. Co. v. City of Fort Smith (D. C.) 294 F. 102, affirmed 270 U. S. 627, 46 S. Ct. 206, 70 L. Ed. 768; New York & Richmond Gas Co. v. Prendergast (D. C.) 10 F.(2d) 167; New York Tel. Co. v. Prendergast (D. C.) 36 F.(2d) 54, and Pacific Telephone & Telegraph Co. v. Whitcomb (D. C.) 12 F.(2d) 279. Going value must not be ascertained by a formula of capitalizing alleged past deficits. Galveston Elec. Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678. At bar the master did not base his percentages on evidence submitted by the plaintiff as to going value which was claimed to be about 15 per cent., but within the range of the evidence, the master could have reached, as he did, the conclusion that 10 per cent. of the physical properties represented the going value of the plaintiff. Therefore the objections of the defendants as to the going value are overruled.

### Bus Competition.

In 1923, the plaintiff voluntarily incorporated the International Bus Corporation. At that time the state law did not permit the plaintiff to operate bus lines directly. Therefore this subsidiary was organized and carried on a business of transporting passengers by motorbus routes, some of which paralleled the lines of the plaintiff in the city of Buffalo. Plaintiff's general office staff operated the bus system, and the bus corporation paid the plaintiff company 14 per cent. of the salaries and expenses of the offices and general office force of the plaintiff. This estimate was computed on the basis of car miles and bus miles operated. The buses carried about one-tenth of the number of passengers that the street cars carried annually. An examination of the map, Exhibit 259, makes it clear that the car lines and buses competed in part at least, and that in the absence of buses, some of the bus passengers would use the cars. Defendants urge that 50 per cent. was a fair estimate of the bus riders who would use the cars, but the master refused to make a finding as to this. The defendants argue that the plaintiff is not entitled to the relief prayed for because it failed to prove the effect upon the passenger traffic of the cars and the resulting revenues derived therefrom by reason of the bus competition and urge that by reason thereof, it has failed to show confiscation of its street railway property. The master concluded that the incorporation of the subsidiary was to the advantage of the public and a proper business undertaking of the plaintiff to avoid outside competition.

 There are authorities which discuss contracts made by utilities claiming confiscation whereby revenues are diverted to affiliated corporations. The test is whether, because of the intercorporate relations, the plaintiff claiming confiscation is improperly diverting its revenue to other corporations. The subject is treated at some length by Lilienthal, "Law of Public Utility Holding Companies," 29 Col. Law Review, 404 (1929); 31 Col. Law Review, 189 (1931). The cases in which the question arose have shown the usual intercorporate relations between an operating utility and a dominant nonoperating utility holding corporation. A case involving the rights of a dominant operating utility competing with its subsidiary is still one of first impression.

The contractual intercorporate relationship between the American Telephone & Telegraph Company and its operating subsidiaries whereby the former obtained a percentage of the gross revenue of the operating company for services rendered to the operating company was considered by the Supreme Court in Southwestern Bell Tel. Co. v. Houston, 259 U. S. 318, 42 S. Ct. 486, 488, 66 L. Ed. 961. There the city of Houston sought a dismissal because the company had not proved profits made by the American Telephone & Telegraph Company and by the Western Electric Company on contracts with the company claiming confiscation. The court said: "It is contended by the City that no fair disclosure was made of the profits made by the furnishing companies on the instruments and on the material and supplies so furnished, and that, for this unique reason, the Company should not be heard in a court of equity and the case should be dismissed. It is true that the Company did not introduce proof to show what the profits of the two companies were, either upon the business done with it or on their entire business but it did introduce much evidence tending to show that the charge made and allowed for the services rendered and supplies furnished by them was reasonable and less than the same could be obtained for from other sources. Under the circumstances disclosed in the evidence, the fact that the American Telegraph & Telephone Company controlled the Company and

the Western Electric Company by stock ownership is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the Company, but the court recognized and applied this rule." See, also, Southwestern Bell Tel. Co. v. Public Service Comm., 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Northwestern Bell Tel. Co. v. Spillman (D. C.) 6 F.(2d) 663; New York Tel. Co. v. Prendergast (D. C.) 36 F.(2d) 54; United Fuel Gas Co. v. Railroad Comm., 278 U. S. 300, 49 S. Ct. 150, 73 L. Ed. 390. But there is no presumption of fairness or even reasonable market value of the services under the contract and the same must be proved. Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255.

■ Under the circumstances, the bus service was reasonably undertaken by the plaintiff. The plaintiff was engaged in the transportation of passengers. With the advent of motorbuses, much passenger traffic was diverted from street cars. If the plaintiff had not entered the motorbus transportation business, some other corporation might, and in all likelihood would, have done so. The effect of this bus transportation was proven by the plaintiff, showing the receipts, and the number of passengers carried, together with the decline of passenger traffic on the plaintiff's car lines. The commission treated each enterprise separately, both as to property and earnings. In the plaintiff's report to that body, and in its regulation, the plaintiff was obliged only to account for its property used in car transportation and at no time did the commission regard the two as one entire system. We think the master properly found that the intercorporate relations promoted public convenience and also that it did not, as argued by the defendants, affect the competition of car lines. The plaintiff should not and probably could not prove the effect of this competition upon its revenues received from the street railway transportation.

■ Heat and power is supplied by gas and electric companies; one to a large extent competes with the other. But in organization and regulations they have always been regarded and treated separately. In like manner the two methods of furnishing passenger transportation should be separately organized and regulated. The master properly held that the engagement in bus transportation by the plaintiff under the circumstances will not defeat the right of the plaintiff to claim confiscation in this suit.

Other questions argued need not be considered at length. The alleged restriction of the Milburn agreement upon the power of the commission to regulate the rates to be charged we considered on the motion for a preliminary injunction and held contrary to the argument of defendants now presented. International R. Co. v. Prendergast (D. C.) 52 F.(2d) 293; International R. Co. v. Public Service Comm., 226 N. Y. 474, 124 N. E. 123.

■ Since the rate of return found by the master is based upon an erroneous theory, and that found, using the defendants' figures on depreciation, is high enough to avoid confiscation, the master's conclusion cannot be adopted.

We therefore hold that there is not a confiscation of plaintiff's property if the commission's rates continue to be enforced, and the plaintiff is not entitled to the relief it seeks.

The application to confirm the master's report is denied.