In the Matter of ROCHESTER GAS AND ELECTRIC CORPORATION, Petitioner, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent, and ROBERT ABRAMS, as Attorney-General of the State of New York, Intervenor-Respondent.

Third Department, May 8, 1986

## APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle (Scott M. Turner* and *John J. Diehl* of counsel), for petitioner.

*David E. Blabey (Glenn D. Haake* of counsel), for respondent.

*Robert Abrams, Attorney-General (Richard W. Golden* of counsel), for intervenor-respondent.

### OPINION OF THE COURT

MAIN, J. P.

Before exploring this case's central issue of whether petitioner should be permitted to recover the repair costs incurred as a result of extensive damages to one of its steam generators and the resultant unscheduled outage from the funds generated by the rates it charges its customers, consideration of some background is both necessary and helpful. The Ginna Nuclear Power Plant (Ginna) is located on the shore of Lake Ontario, some 16 miles east of the City of Rochester, and has been in operation for many years. It is both owned and operated exclusively by petitioner. Early in 1975, the Westinghouse Corporation, which manufactured the plant, a pressurized water steam supply system, advised petitioner to remove the downcover flow resistance (DFR) plate from each of the plant's two steam generators. This procedure involved, *inter alia,* the removal of 1,500-pound steel rings approximately 13 feet in diameter, followed by removal of the DFR plates from the top or ceiling area of the generators. These areas were irradiated, and workers from petitioner then began the removal procedure by weld-cutting each of the large plates into pieces which measured approximately 4 inches by 6 inches by one-half inch and weighed about 3 ½ pounds, after which each piece was carried up and out a hatchway at the top of the generators. This work was done during April 1975, and upon completion, the plant was returned to service. As time went on, there was an unexplained pattern of tube damage in the B generator, with the tubes experiencing rapid degenera-

tion for no reason that was then apparent until finally, on January 25, 1982, almost seven years after the repairs, a tube in generator B ruptured, forcing an unscheduled shutdown. Fortunately, there were no injuries, but there was extensive damage to the plant and some release of radioactivity into the atmosphere. As a result of the shutdown and resultant loss of electric power, petitioner was compelled to obtain power from other sources and did so at a cost of between $10.2 million and $14.1 million, which cost has been passed along to the ratepayers through the automatic rate adjustment method (see, Public Service Law § 66; 16 NYCRR 136.58). In addition, petitioner was required to spend $2.5 million to repair the damages caused by the ruptured tube in generator B.

During the shutdown, petitioner conducted an inspection and discovered the presence, inside of generator B, of a loose metal piece of the same kind and dimension as those cut and supposedly removed during the 1975 repair process. Petitioner concluded that this metal piece was, in fact, part of the DFR plate dismantled by petitioner in 1975 and that it had been inadvertently left behind by one of the workers during the removal process. In its report to the Federal Nuclear Regulatory Commission in explanation of the shutdown, petitioner opined that the damage to generator B was due to the repeated collisions of the overlooked metal piece and the tube. Moreover, the staff of respondent, after conducting its own investigation, reached the same conclusion.

Thereafter, respondent issued an order for the commencement of formal administrative proceedings so as "to provide the public with an opportunity to examine the reasonableness of [petitioner's] actions". After extensive hearings, the Administrative Law Judges determined that petitioner had acted prudently and, accordingly, recommended that petitioner would not be required to refund to its customers the amount that it had collected from them through the automatic rate adjustment charges to reflect the increased cost of the replacement energy. After remand for the development of additional evidence, respondent issued its decision in which it found that petitioner was prudent in using its procedures for removal of the DFR plates, that the workers utilized by petitioner in the removal process were qualified and properly trained and that petitioner's response to the gradual tube degradation after the removal of the DFR plates was not imprudent. It did find, however, that petitioner was imprudent in leaving behind, in generator B, a piece of the DFR plate. Because this impru-

dence was the cause of the tube rupture necessitating the shutdown, respondent refused to allow petitioner, through increased rates, to recover the cost of repairs. However, petitioner was not required to refund to its ratepayers the replacement energy costs that it incurred during the shutdown. Following the denial of its motion for a rehearing by respondent, petitioner commenced this CPLR article 78 proceeding seeking annulment of that portion of the decision which denied it recovery of the repair costs incurred.

Petitioner first contends that respondent's decision holding it responsible for the allegedly imprudent act of its employee or employees in leaving behind the piece of metal plate represents a departure from established ratemaking principles because, in previous cases, recovery of unanticipated costs through automatic rate adjustment was denied only when the costs were the result of management imprudence and not employee mistakes or oversights. Retroactive application of this allegedly new principle or standard, petitioner asserts, constitutes a denial of due process rights. We are unable to agree and find the contention to be without merit. In the previous cases before respondent referred to by petitioner, respondent explored primarily the issue of management, not employee, imprudence. In *Matter of Consolidated Edison Co.* (opn No. 82-2), one of the cases relied upon by petitioner in support of its assertion, it is stated in unambiguous language that "the erroneous responses or the clear mistakes of [a utility's] employees *might,* in certain circumstances, lead to a finding of imprudence. The issue turns upon the particular facts and circumstances of the case" (emphasis supplied). Hence, prior to the commencement of this proceeding, there was a clear pronouncement that, under certain circumstances, management might be held accountable for employee imprudence so that there was no adoption of a new or different standard or policy in the case at bar. Even if such had been the case and respondent had indeed deviated from its established policy, such conduct would not insulate petitioner from responsibility, for "[s]tare decisis is no more an inexorable command for administrative agencies than it is for courts" *(Matter of Field Delivery Serv. [Roberts],* 66 NY2d 516, 518). A new or altered administrative policy might be successfully challenged as an abuse of discretion only if petitioner could demonstrate substantial adverse consequences due to its dependence on the past policy. The task of establishing such reliance rests upon the challenger, and petitioner has failed to

sustain its burden *(cf. National Labor Relations Bd. v Weingarten, Inc.,* 420 US 251). The use by an administrative agency of the evolutional approach is particularly fitting *(supra,* at p 265). Respondent has been delegated, by the Legislature, the difficult and sensitive responsibility of balancing the conflicting interests of the public and the utilities. In fulfilling that obligation, it cannot become stagnated but must adapt to the changing patterns in the industry, and rational responses by respondent should not be a target of judicial intervention.

We now turn to petitioner's remaining argument that respondent's determination, that an employee or employees of petitioner acted unreasonably in leaving the piece of the DFR plate within the generator, was not supported by record evidence. Once more we must disagree with petitioner. The Legislature has granted to respondent the very broadest of powers, and it is not too much to say that in this respect respondent is the alter ego of the Legislature *(Matter of Campo Corp. v Feinberg,* 279 App Div 302, 305, *affd* 303 NY 995; *see, Matter of International Ry. Co. v Public Serv. Commn.,* 226 NY 474). If respondent's determination has any rational basis that would appeal to a reasonable mind, it cannot be held by the courts to be arbitrary or unreasonable *(Matter of Campo Corp. v Feinberg, supra,* p 307). Moreover, respondent's determination need not be wholly free from error to be founded on a reasonable basis *(Matter of City of New York v Public Serv. Commn.,* 17 AD2d 581, *lv denied* 13 NY2d 594). Even if the opponent presents arguments that are reasonable and debatable, respondent's decision will not be disturbed *(see, Matter of Legislature of County of Rockland v New York State Public Serv. Commn.,* 49 AD2d 484). These principles have recently been repeated and reaffirmed by the Court of Appeals *(see, Matter of Abrams v Public Serv. Commn.,* 67 NY2d 205). Such judicial deference is entirely justified and desirable by reason of the technical nature of ratemaking, of which recovery of cost of repair is an element, and the special expertise and competence required by respondent *(see, Matter of Consumer Protection Bd. v Public Serv. Commn.,* 97 AD2d 320). Accordingly, if the record provides substantial evidence to support the determination of respondent, we have no choice but to confirm.

With these limitations upon the scope of our review in clear focus, we conclude that respondent's determination is both supported by substantial evidence and reasonable. It is beyond question that an employee or employees of petitioner left a

portion of the DFR plate inside of generator B after renovating or repairing it in 1975. Likewise, it was equally well established and, in fact, conceded that the tube rupture was caused by the impaction of that portion of the overlooked DFR plate against a tube of generator B thus necessitating the repairs to the generator. Petitioner's employees were engaged in a very dangerous activity, considering the almost limitless potential consequences of an imprudent act. Considering all of the facts and circumstances of this case, it cannot be said that respondent erred in strictly applying its general prudence standard of what a reasonable person would do under the circumstances without the benefit of hindsight, and then finding that the conduct of petitioner's employee or employees was unreasonable.

Inasmuch as respondent's determination was rational, founded on a reasonable basis and supported by substantial evidence, it should be confirmed.

WEISS, MIKOLL, YESAWICH, JR., and LEVINE, JJ., concur.

Determination confirmed, and petition dismissed, with one bill of costs.