Sara A. Kelsey Formal Opinion Deputy Superintendent and Counsel No. 2004-F5 New York State Banking Department One State Street New York, New York 10004-1417
Dear Ms. Kelsey:
You have asked whether the prohibition on unlicenced check-cashing in Banking Law § 367(1) applies to persons or entities engaged in the business of cashing only commercial checks, i.e., checks that are payable to an entity other than a natural person. We conclude that this prohibition applies to all persons or entities that engage in the business of cashing checks, regardless of whether the checks are payable to natural persons or commercial entities. Accordingly, any person or entity that would engage in the business of cashing checks and is not otherwise exempt from the licensing requirements must first obtain a license from the Department under Article 9-A of the Banking Law.
You also have asked whether the Department has the authority to modify, eliminate, or waive any of the Article 9-A statutory requirements for the cashing of checks payable to corporations and other commercial entities. We conclude that while there is generally no authority for categorical exemptions, there may be grounds for the Superintendent to consider the corporate nature of the customer in exercising her delegated authority to set the maximum fees that may be charged by licensees.
I. BACKGROUND
Article 9-A of the Banking Law, enacted in 1944, governs the licensing and regulation of the business of cashing checks. Under this scheme, it is illegal to engage in the business of cashing checks for consideration without obtaining a license from the Superintendent of Banks. See
Banking Law § 367(1). This Article does not apply to the cashing of checks for a nominal fee of one dollar or less incidental to the conduct of another business, or to banks and other entities that operate pursuant to other provisions of the Banking Law. Id. § 374(1). In determining whether to issue a check cashing license, the Superintendent must consider the financial responsibility, experience, and character of the applicant, and must find that granting the license will promote the convenience and advantage of the public where the business will be conducted. Id.
§ 369(1). A license is granted to operate a check cashing business at a specific location, id. § 370, and the Superintendent may not issue a license for a location that is within three-tenths of a mile from an existing licensee. Id.
§ 369(1). The provisions of Article 9-A also regulate the business practices of licensees. Licensed check cashers may not charge fees in excess of the maximum fee set by State regulation. Id.
§ 371; 3 N.Y.C.R.R. 400.12. Licensees are also prohibited from engaging in the business of making loans and in the discounting of notes, bills and checks, and such businesses may not be conducted on the same premises as a check cashing business. Banking Law § 373(1). Except for certain categorical exemptions, licensees are also prohibited from cashing checks that exceed $6,000. Id.[1] A licensee must maintain liquid assets of $10,000, id. § 367(4), and keep records and accounts as specified by the Superintendent, id. § 372(5).
Your inquiry concerns whether this licensing and regulatory scheme applies to businesses that cash checks only for corporations and other commercial entities.[2] Based upon the plain language of the statute, and consistent with its legislative history and purpose, we conclude that the reach of the statutory scheme does not depend on whether the checks cashed are payable to natural persons. All entities engaged in the business of cashing checks, unless otherwise exempt, must obtain a license and comply with the statutory requirements.
II. ANALYSIS
As you recognize, the plain language of Article 9-A covers commercial check cashers. See Banking Law § 367(1). Your letter suggests two possible reasons for departing from the statute's plain language: (1) the statute's origin in concerns about the protection of immigrant defense workers and other vulnerable individuals; and (2) past agency interpretation of the statute. We conclude that neither of these provides a persuasive reason for departing from the statute's plain language.
A. The Statutory Language
The scope of Article 9-A is defined by Banking Law § 367(1), which provides: "No person, partnership, association or corporation shall engage in the business of cashing checks, drafts or money orders for a consideration without first obtaining a license from the superintendent."
In our view, businesses that cash checks only for corporations and other commercial entities fall within the plain language of this provision. As described in your letter, these persons and entities engage in the business of cashing checks for consideration.[3] They differ from other check-cashing businesses only in that the checks they cash are not payable to natural persons. Further, they do not fall within any of the explicit statutory exceptions to the regulatory scheme: They do not cash checks for a nominal fee as an incident to the conduct of another business and are not subject to regulation under another article of the Banking Law. See Banking Law § 374(1) (Article 9-A does not apply to cashing of checks incidental to conduct of another business where less than one dollar charged or to financial institutions subject to regulation under another article of the Banking Law).
Nothing in the language of section 367, or any other provision of Article 9-A, limits application of the Article to businesses that cash checks for individual consumers, excludes businesses that cash checks only for corporations or other commercial entities, or in any way distinguishes regulated businesses with respect to the customers served. The absence of such language from Article 9-A is notable because the same criterion — whether the customer is a natural person or corporate entity — is used in other provisions of the Banking Law to define the scope of the Department's regulatory authority. See Banking Law § 340 (prohibition on business of making loans without a license applies to consumer and individual investment loans of $25,000 or less and to commercial or business loans of $50,000 or less); id. § 491(7) (defining licensed sales finance companies as businesses involved in purchasing retail installment contracts). The inclusion of this criterion in other provisions suggests that the Legislature considered its relevance generally, and decided it was not appropriately applied to the licensing of check cashers. SeeMatter of Gruber [New York City Dept. of Personnel, 89 N.Y.2d 225, 234
(1996) (absence of statutory language is significant where Legislature used terms in other provisions of the same general law); Matter of Liaov. New York State Banking Dep't, 74 N.Y.2d 505, 510-11 (1989) (explicit inclusion of consideration of "destructive competition" in another section of the Banking Law manifests legislative intent to exclude factor from check cashing licensing process). Thus, Article 9-A appears to require licensing of all those engaged in the check cashing business, except those specifically excepted.
Nor do we find any evidence in Article 9-A's legislative history that the Legislature intended to exclude from regulation businesses that cash checks only for corporations and other commercial entities. Indeed, there is evidence that, at least in the early years of the licensing scheme, a significant portion of the customers of licensed check cashers included businesses. For example, when the statutory cap on the amount of a check that could be cashed was first enacted in 1947, the Check Cashers Association opposed the bill in large part because of the effect the cap would have on the many small businesses that regularly relied on check cashing services for their banking needs, including contractors in the garment industry, art dealers, merchants, jobbers and printers. See
Memorandum of Check Cashers Ass'n of N.Y. in opposition (Feb. 13, 1947),reprinted in Bill Jacket for ch. 485 (1947), at 7, 15; see also Bill Jacket for ch. 485 (1947), at 18-20 (editorials supporting check cashers' position); Memorandum of Check Cashers Ass'n of N.Y. in opposition (March 18, 1958), reprinted in Bill Jacket for ch. 350 (1958), at 14 (opposing $500 cap on grounds many small businessmen attempt to cash checks over this amount).[4]
Although the legislative history to later amendments to the statutory cap focuses on the needs of consumers to cash larger checks,[5] these references are insufficient to evidence an intent to exclude commercial check cashers from the licensing scheme. Notably, there is no evidence that in enacting these or other amendments, the Legislature considered the Department's construction of the statute as excluding check cashers who cash checks solely for other businesses. See Matter of ATT v.State Tax Comm'n, 61 N.Y.2d 393, 404 (1984) ("the Legislature is charged with knowledge of the practical construction of a statute only where it is well known"); cf. Uniformed Firefighters Ass'n v. Beekman,52 N.Y.2d 463, 472 (1981) (reenactment by Legislature without change in statutory wording indicates acceptance of agency's long-standing practical construction where Legislature was annually appraised of controversy and recent bill sponsor expressly endorsed this interpretation).
In sum, the statutory language and its legislative history support the view that check cashers who cash checks only for corporations and other commercial entities are subject to the licensing and regulatory requirements of Article 9-A.
B. The Statute's Purpose
The statute's purpose does not appear to allow disregard of its plain language. Courts have recognized that a departure from the literal construction of a statute may be warranted in limited circumstances where such construction would "frustrate the statutory purposes." SeeUniformed Firefighters Ass'n, 52 N.Y.2d at 471-72; Council of New YorkCity v. Giuliani, 93 N.Y.2d 60, 69 (1999) ("`Literal meanings of words are not to be adhered to or suffered to defeat the general purpose and manifest policy intended to be promoted.'" (quoting People v. Ryan,274 N.Y. 149, 152 (1937))).
That is not the case here. As described in an opinion of the Attorney General that was contemporaneous with Article 9-A's enactment, its purposes were two-fold: "the protection of those who are unable to utilize regular banking services and must use the facilities of persons deriving income from the business of cashing checks, and [the prevention of] abuses in the lending of money through illegal and exorbitant interest in the guise of charges for check cashing." 1944 Op. Att'y Gen. 199.
These purposes are not inconsistent with a literal interpretation of the broad language of Banking Law § 367(1). Commercial entities could well be among "those who are unable to utilize regular banking services." 1944 Op. Att'y Gen. 199. Indeed, the legislative history indicates that the small businesses that utilized check cashing services did so because they needed ready cash to meet payroll and other obligations, and could not wait for checks to clear through the traditional banking system.See, e.g., Memorandum of Check Cashing Ass'n of N.Y. in opposition (Feb. 13, 1947), reprinted in Bill Jacket for ch. 485 (1947), at 6.
With respect to the Act's second purpose — the prevention of lending abuses — commercial entities are not invulnerable to lending abuses, nor are they undeserving of protection from these abuses. Cf. General Obligations Law § 5-521(3) (permitting corporation to raise defense of usury in civil actions where rate of interest violates penal law).[6]
Further, if the broad purposes underlying the regulation of check-cashers did not justify the regulation of those who cash only checks payable to commercial entities, one would expect to find limitations to this effect in the laws of other states that regulate check-cashers. But although a number of states have adopted licensing schemes similar to New York's, none of these states appear to have explicitly limited the scope of its licensing scheme to the cashing of checks payable to natural persons. See, e.g., Ky. Stat. § 368.030; Mass. Gen. Laws 169A § 2; Ohio Rev. Code § 1315.22; Penn. Stat. ch. 63, § 2311. What is more, there is evidence that several of these schemes were plainly intended to reach the cashing of checks payable to commercial entities. For example, some of these state licensing schemes prohibit the licensee from cashing checks "payable to a payee other than a natural person" without first obtaining documentation that the person presenting the check is authorized to present it. See Ga. Code §7-1-705(e); Ind. Code § 28-8-5-16(a)(4); Ky. Stat. § 368.100(4); N.C. Gen. Stat. § 53-283(6); N.J. Stat. § 17:15A-47(a); S.C. Code §34-41-80(6).
C. Prior Agency Interpretation
Nor would deference to the Department's prior interpretation of Banking Law § 367(1) support a departure from the statute's plain language. As indicated by the letters you supplied with your opinion request, staff of the Department occasionally have advised persons that "the intent [of Article 9-A] is to protect only natural persons who utilize check cashers" and that a person or other entity therefore "may engage in the business of cashing checks for corporations without first obtaining a license from the Superintendent of Banks" (Letter of January 17, 1996). The first of these letters is dated January 10, 1984.
In our view, this interpretation is not entitled to any special deference. An agency's interpretation of a statute it is charged with implementing "`is entitled to varying degrees of judicial deference depending upon the extent to which the interpretation relies upon the special competence the agency is presumed to have developed in its administration of the statute.'" Matter of Gruber, 89 N.Y.2d at 231
(quoting Matter of Rosen v. Public Employees Relations Bd., 72 N.Y.2d 42,47 (1988)). Where the question involves specialized "knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, the courts should defer to the administrative agency's interpretation unless irrational or unreasonable." Matter of Dworman v. New York State Div. ofHous. and Cmty. Renewal, 94 N.Y.2d 359, 371 (1999) (internal quotations omitted). In contrast, where "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency." Kurcsics v.Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459 (1980); see also Matter ofMoran Towing and Trans. Co. v. New York State Tax Comm'n, 72 N.Y.2d 166,173 (1988) ("Ultimately . . . legal interpretation is the court's responsibility; it cannot be delegated to the agency charged with the statute's enforcement.").
It does not appear that the determination whether an entity is "engage[d] in the business of cashing checks, drafts or money orders for a consideration" within the meaning of Banking Law § 367 requires agency expertise, specialized knowledge or an understanding of operational practices. Rather, the question here appears to be one of pure statutory analysis, and deference to the agency interpretation would thus be unwarranted.
This view is consistent with Matter of Liao v. New York State BankingDepartment, 74 N.Y.2d 505 (1989), in which the Court of Appeals declined to accord deference to the Department's interpretation of another statute governing check-cashing businesses. In Matter of Liao, the Court reviewed a Department policy that required "an evaluation of potential destructive competition" prior to the issuance of a license to a check-cashing business. 74 N.Y.2d at 510. The Court noted that the Legislature had explicitly enumerated the factors to be considered in evaluating a license application and, because the issue was one of pure statutory construction, declined to defer to the Department's expertise in this matter. 74 N.Y.2d at 510, 511-12.
Moreover, even in situations involving agency expertise where deference would ordinarily be appropriate, an agency's interpretation that is at odds with the plain language of a statute is accorded little weight.See Matter of Liao, 74 N.Y.2d at 512 ("If the agency's implementation of its powers violates the clear enablement of the statute, we need accord it no weight."); Matter of Raritan Dev. Corp. v. Silva, 91 N.Y.2d 98, 102
(1997) ("a determination by the agency that `runs counter to the clear wording of a statutory provision' is given little weight'" (quotingKurcsics v. Merchants Mut. Ins. Co., 49 N.Y.2d at 459)).
Thus, the fact that the Department has previously interpreted the statute as inapplicable to commercial check cashers in no way precludes the Department from adopting a new interpretation. "Stare decisis is no more an inexorable command for administrative agencies than it is for courts. They are, therefore, free, like courts, to correct a prior erroneous interpretation of the law." Matter of Charles A. Field DeliveryServ., 66 N.Y.2d 516, 518-19 (1985) (internal citations omitted); Matterof Irish Int'l Airlines [Levine], 48 A.D.2d 202, 203 (3d Dep't 1975) (agency had obligation to correct determination based on erroneous interpretation of statute), aff'd for reasons stated below, 41 N.Y.2d 819
(1977). Cf. State Administrative Procedure Act § 204(1) ("nothing in this section shall prevent an agency from prospectively changing any declaratory ruling").
Consequently, we conclude that there is no basis for departing from the plain language of Article 9-A by exempting businesses that cash checks only for corporations and other commercial entities.
D. The Department's Authority to Relax the Requirements of Article 9-A
You have further asked whether, assuming that businesses which cash checks only for corporations and other commercial entities are subject to the requirements of Article 9-A, the Department has the authority to modify, eliminate, or waive any of the requirements for these businesses. These statutory requirements include the prohibition on granting a new license for a place of business within three-tenths of a mile of an existing licensee, Banking Law § 369(1); the $6,000 cap on the amount of a check that may be cashed by licensees, id. § 373(1); the limitation on the maximum fees that may be charged, id.
§ 372(1); and certain other prohibited acts, see id. § 373 (prohibiting licensees from making loans and discounting notes, bills and checks, and prohibiting such activities on the same premises as a check cashing business). Your concern is apparently that commercial check cashers will find it difficult to satisfy these statutory criteria (such as the $6,000 cap), or that complying with these standards (such as the maximum fees that may be charged) will require a significant departure from their current practices. With respect to the three-tenths of a mile restriction, your concern is apparently that some commercial check cashing businesses may be located within three-tenths of a mile of an existing licensee and thus would be precluded from obtaining a license for that location under this rule. Moreover, the statute directs that the three-tenths of a mile be measured "on a straight line along the street between the nearest point of the store fronts of the check cashing facilities," Banking Law § 369(1), and you have indicated that commercial check cashers do not generally operate from street-level "store fronts." You explain that the modification or waiver of these statutory requirements, if permissible, might help ameliorate the effects of a change in the Department's policy.
We first note that these provisions are mandatory in nature. For example, the minimum-distance requirement says simply: "No license shall be issued to an applicant for a license, at a location to be licensed which is closer than one thousand five hundred eighty-four feet (three-tenths of a mile) from an existing licensee." Banking Law § 369(1);see also id. § 373(1) ("No licensee shall engage in the business of making loans . . ., nor shall a loan business . . . be conducted on the same premises where the licensee is conducting business pursuant to the provisions of this article."); id. ("No licensee shall cash any check, draft or money order if the face amount for which it is drawn is in excess of six thousand dollars."). Moreover, the mandatory language of these provisions is in contrast to other provisions that specifically grant the Superintendent discretion to vary their requirements. For example, Banking Law § 367(3) grants the Superintendent the power to waive the $100 investigative fee "in his discretion." And Banking Law §369(1) grants the Superintendent the power to "permit a reduction from ten thousand dollars to not less than five thousand dollars of minimum liquid assets required for each location."
Given the mandatory nature of the requirements you identify, we believe the Department lacks the power to modify these requirements on a categorical basis. As the Court of Appeals explained in another case involving the check-cashing law, administrative agencies generally do not have the power to modify statutory mandates:
 Administrative agencies, as creatures of the Legislature within the executive branch, can act only to implement their charter as it is written and as given to them. An agency cannot create rules, through its own interstitial declaration, that were not contemplated or authorized by the Legislature and thus, in effect, empower themselves to rewrite or add substantially to the administrative charter itself.
Matter of Liao, 74 N.Y.2d at 511 (citations omitted).[7]
We note, however, that the Department's authority to modify the maximum fees charged by licensees is arguably somewhat broader because the statute delegates to the Superintendent the authority to set these fees.See Banking Law § 372 ("The superintendent shall, by regulation, establish the maximum fees which may be charged by licensees for cashing a check, draft, or money order. No licensee shall charge or collect any sum for cashing a check, draft, or money order in excess of that established by the superintendent's regulations."). The question in this context would be whether, in exercising that delegated authority, the Superintendent could set a maximum fee for the cashing of checks payable to corporations that differs from the maximum fee for other checks. Before 1983, the maximum fees were set by statute. As initially enacted, one fee applied to all checks cashed. See Law 1944, ch. 593. In 1954, the Legislature amended the fee provision to permit a higher maximum fee for cashing out-of-state checks to account for the higher service charges incurred by check cashers in processing these checks.[8] See Memorandum of Banking Dep't (March 25, 1954), reprinted in Bill Jacket for ch. 466 (1954), at 3. The authority to set the maximum fees was delegated to the Superintendent in 1983 in recognition of the fact that the Legislature had historically relied upon the Department's recommendation in determining the appropriate fee based upon current market conditions, and to allow for timely adjustments. See Assembly Sponsor's Memorandum,reprinted in Bill Jacket for ch. 263 (1983), at 7; Letter of Herman D. Farrell, Jr., Chair of Assembly Banks Committee (May 31, 1983), reprintedin Bill Jacket for ch. 263 (1983), at 11. In view of the Legislature's decision to grant the Superintendent the authority to set fees, it is at least arguable that this includes the authority to set different fees where there is a rational basis for making such distinctions.
While there may be limited grounds for the Superintendent to consider the corporate nature of the check casher's customers in implementing the maximum fees rule, we do not believe the statutory scheme provides any basis for modification of the three-tenths of a mile restriction on the granting of licenses, the $6,000 cap on the amount of a check that may be cashed by a licensee, or the other prohibited acts. The Department has not been granted discretion to implement the three-tenths of a mile rule, the statutory cap and other prohibited acts, and legislative history provides no basis for considering the corporate nature of the customer with respect to these prohibitions.[9]
III. CONCLUSION
We conclude that the licensing and regulatory requirements of Article 9-A apply to all businesses (not otherwise exempt) that cash checks for consideration, including those that cash checks only for corporations and other non-natural persons. While there is no general authority for waiving or modifying the statutory requirements for this group of check cashers, the Department may explore whether it would be appropriate to consider the corporate nature of the customer in exercising its delegated authority to set the maximum fees permitted to be charged by licensees.
Very truly yours,
ELIOT SPITZER, Attorney General
[1] The statutory cap does not apply to certain categories of checks, including those drawn by the United States, a state or a political subdivision, a banking institution, an insurance company, or a licensed securities broker, as well as checks for the settlement of claims and certified bank checks.
[2] You have indicated that staff of the Banking Department, relying upon the purpose for which the statute was enacted and the regulatory criteria applicable to licensees, have interpreted the law as inapplicable to entities that only cash checks payable to corporations or other non-natural persons. Thus, the Department has taken the position that such entities are not required to be licensed under Article 9-A. However, staff have taken the position that licensees who may cash checks both for natural persons and commercial entities must comply with the statutory criteria for all checks cashed.
[3] For purposes of this opinion, we assume that the activity at issue constitutes "the business of cashing checks" within the meaning of section 367, rather than some other financial or commercial transaction.
[4] There is also evidence that check cashers engaged in cashing checks for businesses, such as manufacturing wholesalers and jobbers, considered themselves subject to the licensing statute when it was first enacted.See Letter of Samuel Kuflik in opposition (March 22, 1944), reprinted in
Bill Jacket for ch. 593 (1944), at 11.
[5] See, e.g., Memorandum of Banking Department (March 18, 1958),reprinted in Bill Jacket for ch. 350 (1958), at 8; Bill Jacket for ch. 461 (1974), at 2 (sponsor's memorandum), at 7 (Banking Department memorandum); at 11 (Budget Report); Sponsor's Memorandum in support (June 16, 1997), reprinted in Bill Jacket for ch. 144 (1997), at 6.
[6] While you have pointed to some evidence indicating that a primary concern prompting the enactment of Article 9-A was the protection of defense workers who could not readily access banks to cash their paychecks, such evidence would not justify limiting the statute to those who deal with individual consumers. A statute's scope should not be confined to the specific problem that prompted its enactment unless the limitation is warranted by the statutory language or legislative history. See People v. Vetri, 309 N.Y. 401, 411-12 (1955); McKinneys Cons. Laws of N.Y., Book 1, Statutes § 93, cmt. at 186 (1971) ("A statute in general terms is not necessarily to be construed as applying only to temporarily existing evils.").
[7] In light of the mandatory nature of these restrictions and the absence of any Department discretion, we do not believe the statutory reference to "store fronts" provides a sufficient basis for waiving or modifying the three-tenths of a mile rule for commercial check cashers.
[8] This distinction in permissible fees was eliminated by Chapter 235 of the Laws of 1978.
[9] While the possibility remains that application of the new interpretation in individual cases will prove unduly harsh, New York Courts have consistently held that "estoppel cannot be invoked against a governmental agency to prevent it from discharging its statutory duties."Matter of Hamptons Hospital v. Moore, 52 N.Y.2d 88, 93 (1981). Although decisional law recognizes the possibility that "exceptions to the general rule may be warranted in unusual factual situations to prevent injustice," the exception is rarely applied. See Matter of New York StateMedical Transporters Ass'n v. Perales, 77 N.Y.2d 126, 130 (1990) ("estoppel against a governmental agency . . . is foreclosed in all but the rarest of cases" (internal quotation omitted)); Matter of E.F.S.Ventures Corp. v. Foster, 71 N.Y.2d 359, 369 (1988); see also Matter ofRochester Gas Elec. Corp. v. Public Serv. Comm'n of State of N.Y.,117 A.D.2d 156, 159 (3d Dep't 1986) ("A new or altered administrative policy might be successfully challenged as an abuse of discretion only if petitioner could demonstrate substantial adverse consequences due to its dependence on the past policy.").